05-4016-cr
United States v. Griffin

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: December 19, 2006          Decided: December 21, 2007)

Docket No. 05-4016-cr

-------------------------------------

UNITED STATES OF AMERICA,

Appellee,

- v -

MICHAEL J. GRIFFIN,

Defendant-Appellant.

-------------------------------------

Before:   POOLER, SACK, and WESLEY, Circuit Judges.

The defendant-appellant, Michael Griffin, pleaded guilty, pursuant to a plea agreement, in the United States District Court for the Western District of New York (Charles J. Siragusa, Judge), to one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), after unlawfully downloading such images to his computer using a peer-to-peer file-sharing program.  The defendant appeals from the portion of the judgment of conviction sentencing him principally to 120 months' imprisonment, arguing, inter alia, that the government breached the parties' plea agreement by advocating against an acceptance of responsibility adjustment.

Remanded for resentencing by another judge. Judge Wesley dissents in a separate opinion.

BRUCE R. BRYAN, Syracuse, NY, for Defendant-Appellant.

TIFFANY H. LEE, Assistant United States Attorney (Terrance P. Flynn, United States Attorney for the Western District of New York, of counsel), Rochester, NY, for Appellee.

SACK, Circuit Judge:

While there are aspects of this case that may implicate complicated and difficult issues at the unhappy intersection of computer technology and child pornography, we need not and therefore do not address them. The resolution of this appeal hinges on the narrow question of whether the government adhered to the terms of the plea agreement between it and the defendant during sentencing proceedings. Because we conclude that the government breached the plea agreement, we vacate the sentence and remand for resentencing by another district judge.

**BACKGROUND**

On November 23, 2004, the defendant pleaded guilty pursuant to a written plea agreement to one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). By pleading guilty, he admitted that he "knowingly possessed material that contained images of child pornography . . . [that] had been . . . transported in interstate . . . commerce by any means, including by computer . . . ." Plea Agreement of Michael J. Griffin, dated November 23, 2004, in the United States

2

District Court for the Western District of New York, at ¶6 (the "Plea Agreement").

This prosecution arose out of an FBI investigation involving the defendant's use of a peer-to-peer file sharing program called KaZaA (sometimes spelled "Kazaa"). Broadly speaking, KaZaA is a computer program, downloaded to a computer, that allows the computer's user to share and obtain, via the Internet, many types of digital files including photographs and video recordings. The program enables the user to create and maintain a "shared folder" ("KaZaA Shared Folder") on his or her computer's hard drive which, when enabled, allows other users to download files located in that KaZaA Shared Folder onto their own computer's hard drive. A KaZaA user can enable a feature in the program called "sharing disabled" which prevents other KaZaA users from downloading any file from the original user's computer, even if the file is located in the latter's KaZaA Shared Folder. While the "sharing disabled" feature is enabled on a KaZaA user's computer, however, he or she cannot download files from other KaZaA users.[1]

---

[1] See also United States v. Sewell, 457 F.3d 841, 842 (8th Cir. 2006) (describing how KaZaA works and noting that after an individual "downloads" a file from another user's shared folder, "[t]he downloaded file will automatically be placed in the user's [KaZaA] Shared Folder to be searched and downloaded by other users unless the local user disables this feature"). See generally Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd., 380 F.3d 1154, 1158-59 (9th Cir. 2004) (describing mechanics of peer-to-peer file sharing software), vacated and remanded, 545 U.S. 913 (2005).

3

In the plea agreement, Griffin admitted that in October 2003, he had opened approximately ten child pornography images acquired using KaZaA and had deleted six of the images, but that at least four of the images remained on his computer's hard drive. He further acknowledged that he moved two of these images into the "My Documents" folder on his hard drive, and that one of these images depicted a minor under the age of twelve years old. During the plea colloquy before the district court, the government explained that it had not given, and would not give, the defendant a copy of his computer's hard drive, which it had confiscated in accordance with its policy of treating hard drives containing child pornography as contraband, but that the defendant and his representatives could view the images in the government's offices.

The plea agreement left unresolved a variety of disputes between the government and Griffin concerning the application of the United States Sentencing Guidelines, including the proper determination of the defendant's adjusted offense level and the application of several possible enhancements. In order to address these disputes, the district court held an evidentiary hearing that took the better part of four days during June and July 2005. The hearing included testimony from several computer forensic experts on behalf of the government and one on behalf of the defendant. Testimony at these hearings focused on the contents of the defendant's computer hard drives, the initial FBI report produced after the defendant first was interviewed

4

following a search of his home and seizure of his computers, and the operation of KaZaA.

The district court adopted the recommendation of the Probation Office and the government as to the calculation of the Guidelines sentence. It is undisputed that the defendant's base offense level was fifteen. Based on the defendant's use of KaZaA, the district court then applied a cross-reference for "trafficking," which added two levels, United States Sentencing Guidelines Manual ("U.S.S.G.") § 2G2.2(c)(1), and increased the offense level by an additional five levels for distribution with the expectation of receipt of a thing of value, but not pecuniary value, id. § 2G2.2(b)(2)(B). The district court also applied three more two-level enhancements -- for the use of a computer, id. § 2G2.2(b)(5), possession of a photograph of a minor under the age of twelve, id. § 2G2.2(b)(1), and possessing more than 10 but fewer than 150 images, id. § 2G2.2(b)(6)(A) -- and a four-level enhancement for possession of photographs that included sadistic or masochistic conduct, id. § 2G2.2(b)(3). This resulted in an adjusted total offense level of thirty-two.

The defendant had no previous criminal record, so his criminal history fell within category I. The applicable advisory Guidelines range was therefore 121 to 151 months. The district court sentenced Griffin to the statutory maximum sentence of ten years' (120 months') imprisonment. The district court also imposed a life term of supervised release, which included requirements that the defendant register as a sex offender in

5

whichever state in which he lives and that he be subject to searches of his person or property for the duration of the term of supervised release.

### Acceptance of Responsibility

In the plea agreement, the government agreed "not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines §3E1.1(a) (acceptance of responsibility) and further agree[d] to move the Court to apply the additional one (1) level downward adjustment of Guidelines §3E1.1(b)."  Plea Agreement at ¶12.  However, the agreement also permitted the government to "respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government."  Id. at ¶18b.

Prior to sentencing, the defendant submitted his objections to the initial Presentence Investigation Report ("PSR"), which outlined Griffin's sentencing arguments, including his objections to many of the Guidelines enhancements discussed above.  See Defendant's Response to Presentence Investigation Report, dated March 24, 2005 ("Def's March 24 Response").  Of particular note, Griffin argued that the feature of his KaZaA program that disabled its file-sharing capability remained active nearly all of the time, which counseled against applying a cross-reference for trafficking and a further enhancement for distribution.  Id. at 3.  He further contended that he was an

6

inadvertent child-pornography user because the PSR identified only eight of more than 4,500 images on his computer as depicting minors. Id. Griffin also asserted that there was no proof that he knowingly possessed a particularly lewd and notorious video that prompted the application of a four-level enhancement for sadistic or masochistic conduct. Id. at 4-5. The apparent overarching objective of the defendant's objections was to narrow the conduct underlying sentencing to that which Griffin admitted in the plea agreement.

In a letter to the district court following the receipt of the defendant's objections to the PSR, the government wrote:

> [T]he government is troubled by some of the defendant's objections which seem to raise questions regarding whether the defendant has truly accepted responsibility . . . . However, the defendant did timely notify authorities of his intention to enter into a guilty plea, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently.
>
> If the Court finds that the defendant is entitled for [sic] the two-level downward adjustment pursuant to Guidelines §3E1.1(a) for clearly demonstrating acceptance of responsibility, the government submits that the defendant, based on his actions in promptly entering a guilty plea, would be entitled to the further one-level decrease pursuant to § 3E1.1(b).

Statement of the Government with Respect to Sentencing Factors and Motion Pursuant to U.S.S.G. § 3E1.1(b), dated March 31, 2005, at 1-2 ("Gov't March 31 Statement").

7

The government elaborated on its views in its subsequent sentencing brief. There it said that it found "troubling . . . the fact that the defendant is now attempting to distance himself from the other images and movies found in his possession." Government's Response to Defendant's Response to the Presentence Report, dated Apr. 15, 2005, at 20 ("Gov't April 15 Response"). The defendant's conduct therefore "le[d] the government to question whether the defendant has truly accepted responsibility." Id. at 21. The government brief also synthesized cases and commentary related to acceptance of responsibility, noting that "while a guilty plea combined with truthful statements about the defendant's offense and other relevant conduct is 'significant evidence' of acceptance of responsibility, 'it can be outweighed by conduct that is inconsistent with acceptance of responsibility.'" Id. at 21-22 (quoting United States v. Ortiz, 218 F.3d 107, 108 (2d Cir. 2000) (per curiam)). The government concluded:

> It is unclear whether the defendant's objections to the inclusion of all the relevant conduct rises to the level of outweighing his acceptance of responsibility. Suffice it to say that the defendant's objections to the relevant conduct raises [sic] questions on the issue of acceptance.

Id. at 22.[2]

_____

[2] The government also noted that it did not object to the defendant's arguments that the disputed Guidelines enhancements did not apply and was well aware of the defendant's intent to disagree on these points. Gov't April 15 Response at 20.

The district court thereafter made the following determination:

> While the Government, for purposes of the plea, agreed not to oppose a recommendation that I reduce your offense level by a total of three for acceptance of responsibility, I have found otherwise. The Government has not taken any position on that and they have not opposed it. On its own, based on the posture of this case and finding of facts, the Court has denied that.

Sent'g Hr'g Tr., July 14, 2005, at 29.

The defendant now challenges his sentence on several grounds: (1) The government's refusal to provide to him a copy of the confiscated computer hard drives constitutes a violation of Rule 16 of the Federal Rules of Criminal Procedure and Brady v. Maryland, 373 U.S. 83 (1963); (2) the district court's determination that he trafficked and distributed child pornography through his use of KaZaA; (3) the district court's denial of a downward adjustment for acceptance of responsibility; (4) the government's alleged breach of the plea agreement by encouraging the district court to deny an adjustment for acceptance of responsibility; (5) the propriety of the term and provisions of his supervised release; and (6) an alleged violation of the Constitution's Ex Post Facto Clause. Because we conclude that the government breached the plea agreement, which, in this case, requires remand for resentencing de novo, we decline to address the defendant's other arguments.

**DISCUSSION**

I. Breach of the Plea Agreement

9

## A. Legal Standard and Standard of Review

We review interpretations of plea agreements de novo and in accordance with principles of contract law. United States v. Riera, 298 F.3d 128, 133 (2d Cir. 2002) (citing United States v. Padilla, 186 F.3d 136, 139 (2d Cir. 1999)). "To determine whether a plea agreement has been breached, we 'look[] to the reasonable understanding of the parties as to the terms of the agreement.'" Id. (quoting United States v. Colon, 220 F.3d 48, 51 (2d Cir. 2000)). "Because the government ordinarily has certain awesome advantages in bargaining power, any ambiguities in the agreement must be resolved in favor of the defendant." Id. (citations and internal quotation marks omitted). Where plea agreements are involved, the government must take particular "'care in fulfilling its responsibilities.'" United States v. Lawlor, 168 F.3d 633, 637 (2d Cir. 1999) (quoting United States v. Brody, 808 F.2d 944, 948 (2d Cir. 1986)).[3]

Because the defendant did not argue in the district court that the government breached the plea agreement, the government asserts that we must review the argument for plain error. We have held to the contrary that "a defendant is not

---

[3] The statement in Lawlor is that the government must "take much greater care in fulfilling its responsibilities." Lawlor, 168 F.3d at 637 (emphasis added). The context of the statement in the opinion from which this repeated admonishment first emanated suggests that "much greater" means "much greater than the government in fact exercised." See United States v. Januszewski, 777 F.2d 108 (2d Cir. 1985), cited in Brody, 808 F.2d at 948.

10

required to object to the violation of a plea agreement at the sentencing hearing." Lawlor, 168 F.3d at 636 ("Lawlor's claim [that the government breached the plea agreement] is not barred by his failure to raise this issue with the District Court, nor are we bound to apply a plain error standard of review."). The defendant need not demonstrate that any error as to the government's compliance with his plea agreement satisfies plain error review.

B. The Government's Breach

Whether the government breaches a plea agreement by making allegedly impermissible comments to the sentencing court has been the subject of substantial discussion in this Circuit. Our cases have not yielded a bright-line rule as to the leeway the government has with respect to what it tells the court while operating under such an agreement. "[The] circumstances must [therefore] be carefully studied in context, and where the government's commentary reasonably appears to seek to influence the court in a manner incompatible with the agreement, we will not hesitate to find a breach, notwithstanding formal language of disclaimer." United States v. Amico, 416 F.3d 163, 167 n.2 (2d Cir. 2005).

Amico, upon which the government exclusively relies,[4] contains our most recent application of such a fact-specific

---

[4] The government refers to the case as United States v. Peters. Peters was the sole appellant in the appeal. But Amico was the first named defendant in the official caption of the case, and we therefore refer to it using his name.

11

analysis. There, the defendant-appellant made several arguments to support his contention that the government had breached its plea agreement with the him.

First, the defendant-appellant argued that the government's statement that it "adopts the findings of the revised Presentence Investigation Report" violated the plea agreement insofar as this endorsement advocated, by reference, the imposition of a higher sentence than that to which the parties agreed. Id. at 165. Once notified of this violation, however, the government filed an amended statement explaining that it expressly did not advocate the additional enhancements, and it reiterated that position several times thereafter. Id. We noted that "a retraction of an argument advanced by the government in violation of its plea agreement would [not] always cure its breach," but concluded that, "upon careful examination of all the circumstances, especially the mild, brief, and unassertive form of the statement and its rapid retraction, . . . the temporary breach was adequately cured." Id.

Second, the defendant-appellant argued that a government memorandum of law, submitted in response to his objections to the Presentence Investigation Report, violated the plea agreement by advocating a position on an issue about which the plea agreement did not permit discussion. We rejected the argument, concluding: "[The defendant-appellant] opened the door to this response when he attempted to characterize the criminal scheme in a manner favorable to himself, minimized the importance

to the criminal scheme of the mortgage brokers, and claimed not to have known supporting documentation accompanying the loan applications was false." Id. Moreover, the government's discussion of the state of the law in response to the defendant-appellant's "inaccurate description of the law" was considered an appropriate response that was permitted by the agreement, particularly because it was surrounded by several statements to the effect that the government did not intend to advocate the imposition of the additional enhancement. Id. at 166.

Similarly, in Riera, the prosecution and the defense agreed that "neither party will seek . . . a departure," and that neither party will "suggest that the Court sua sponte consider such a departure." 298 F.3d at 133–34. The plea agreement also permitted the parties to respond to inquiries from the district court in the event that the court "contemplate[d] any Guidelines adjustments, departures, or calculations different from those stipulated to [in the agreement]." Id. at 134 (second brackets in original). The defendant asserted that the government breached the agreement when it argued by letter that the district court "would be well within its discretion in upwardly departing" before explaining in detail why such a departure would be appropriate. Id. (internal quotation marks and citation omitted). We stated that the government's letter was "too close in tone and substance to forbidden advocacy to have been well-advised," id. at 134, and "came very close to breaching the agreement," id. at 135.

We found no breach, however, for three reasons:  First, the letter was submitted in response to a solicitation by the court.  Id. at 134-35.  Second, the plea agreement expressly permitted a response to a request from the district court to set forth the relevant facts and advise the court whether a departure would conform to the law.  Id. at 135; see also United States v. Goodman, 165 F.3d 169, 172-73 (2d Cir.) (finding no breach where the government responded to a specific request from the district court to "supply the Court with the law and the facts" without advocating that such an adjustment should be imposed), cert. denied, 528 U.S. 874 (1999).  Third, the government "did not explicitly advocate a departure" and thereafter repeatedly asserted that it was responding to the court's request but was not advocating an upward departure, in line with the plea agreement.  Id. at 135-36.

In United States v. Vaval, 404 F.3d 144 (2d Cir. 2005), we reached the opposite conclusion.  There, the defendant pleaded guilty pursuant to a plea agreement to robbery of federal property with a dangerous weapon.  Id. at 149.  According to the plea agreement, the government was not permitted to "take [a] position concerning where within the Guidelines range determined by the Court the sentence should fall," or to "make [a] motion for an upward departure," as long as no new "information relevant to sentencing" was discovered subsequent to the effective date of the plea agreement.  Id.  The plea agreement incorrectly calculated the defendant's criminal history to fall within

14

category III rather than category II. Id. at 149. At sentencing, the government acknowledged that the plea agreement prevented the government from seeking an upward departure or recommending a particular sentence within the guideline range, but nonetheless stated, inter alia:

> I find this defendant's criminal history appalling. And the fact that he can sit here today and say that he made a mistake, I find completely disingenuous. Because it is a mistake that he has made over and over and over again in terms of robbing people at gun point and using violence to commit robberies. I understand that the guidelines preclude us from looking at or calculating certain offenses. But certainly this is not this defendant's first or second offense.

Id. at 150. The government, after recounting the factual basis for the defendant's conviction, said: "I just ask the Court to consider all of that when making the Court's decision about where to sentence this defendant." Id. The government concluded: "[B]ased on the information that I had at [the] time [of the plea agreement,] I believed that the defendant was going to be in a [CHC] category three. He is in a category two. I think, technically, I could make an upward departure which I am not." Id. (first brackets added).

The district court, which presided over the trial of Vaval's co-defendants, acknowledged the defendant's objections to the government's statements, but asserted that "[t]he government's remarks do not change any view that the Court had of this case coming out here." Id.

15

We first noted that statements by the government asserting that it did not intend to violate the plea agreement "do not . . . insulate the government against a finding of breach if in fact what was said constituted an argument about where within the range to sentence appellant and/or whether to upwardly depart." Id. at 153. We then concluded that the government's "highly negative characterizations" of the defendant's criminal history did not qualify as mere "information," and that a statement that the government "technically" could make an upward departure recommendation effectively qualified as such a recommendation. Id. ("It is difficult to draw a principled distinction between the government actually moving for an upward departure and stating that it 'technically' could move for such a departure and then adding arguments that would support such a departure."). Furthermore, unlike the government's court-solicited statements in Riera, "all relevant legal and factual information had already been provided to the court, and the government's statements served no purpose other than to advocate that the court upwardly depart or impose a high sentence within the Guidelines range." Id. at 154. As a result, we decided, the government had breached the plea agreement. See also Lawlor, 168 F.3d at 637 (finding that the government breached the plea agreement by asserting that the PSR properly determined the Guidelines range where the plea agreement calculated the range under a different (and lower) Guidelines range); United States v. Enriquez, 42 F.3d 769, 770-71 (2d Cir. 1994) (vacating the

16

sentence based on the government's violation of the plea agreement by arguing against a downward adjustment for acceptance of responsibility where the plea agreement required the government to "agree to a Probation Department finding that the defendant is entitled to a two-level adjustment for acceptance of responsibility").[5]

We have also strictly enforced plea agreements against the government where, as here, the disputed issue concerned enhancements or adjustments to a defendant's total offense level rather than a specific sentence within a given Guidelines range or an upward or downward departure from that range. In United States v. Palladino, 347 F.3d 29 (2d Cir. 2003), the plea agreement prohibited the government from moving for an upward departure from the Guidelines range estimated in the agreement "based on information known to [the United States Attorney's Office] at this time." Id. at 33. The estimated total offense level on which that range was based, however, was "not binding" on the government, and the defendant was not permitted to

---

[5] We have also applied this analytical framework to government breaches of plea agreements after the initial sentence has been executed. See United States v. Carbone, 739 F.2d 45, 46-47 (2d Cir. 1985) (concluding that the government breached its promise to "make no recommendation to the sentencing judge as to the sentence which Stephen Carbone may be given" when it strenuously opposed a "split sentence" requested by the defendant after the district judge announced a 30-month term of imprisonment); United States v. Corsentino, 685 F.2d 48, 51–52 (2d Cir. 1982) (finding that the government breached the plea agreement when, despite its agreement to "take no position" on the defendant's sentence, it advocated against permitting the possibility that the defendant might receive an earlier parole).

17

withdraw his plea if the government advocated for a different offense level. Id. The agreement calculated the adjusted offense level to be ten. Id. At sentencing, the government sought a six-level enhancement based on information it conceded was not new. Id. at 34. We concluded that this violated "the language and the spirit" of the plea agreement, id. at 30; at best, the language was ambiguous and was therefore construed against the government, id. at 34.

In Griffin's plea agreement, the government committed itself "not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines §3E1.1(a) (acceptance of responsibility) and further agree[d] to move the Court to apply the additional one (1) level downward adjustment of Guidelines §3E1.1(b)." Plea Agreement at ¶ 12. The agreement also permitted the government to "respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government." Plea Agreement at ¶ 18b.[6]

In response to the defendant's objections to the PSR, the government discussed the possible downward adjustment for

---

[6] In Griffin's plea agreement, the government was permitted to "advocate for a specific sentence within the Guidelines range" and to "modify its position with respect to any sentencing recommendation or sentencing factor under the Guidelines . . . in the event that subsequent to this agreement the government receives previously unknown information regarding the recommendation or factor." Plea Agreement at ¶ 18. Neither party cites either of these provisions on this appeal, so we do not consider their relevance, if any.

18

acceptance of responsibility under U.S.S.G. § 3E1.1 in two separate written submissions to the district court. It first noted that "the government is troubled by some of the defendant's objections which seem to raise questions regarding whether the defendant has truly accepted responsibility." Gov't March 31 Statement, at 1. But the submission continued: "However, the defendant did timely notify authorities of his intention to enter a guilty plea, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." Id. at 1-2. The government then proceeded to recommend that the defendant receive the additional one-level decrease for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b) should the district court find that the defendant is entitled to the two-level adjustment under U.S.S.G. § 3E1.1(a). Were this the government's only communication addressing acceptance of responsibility, we would have little trouble characterizing this submission as containing a "few ill-advised descriptive words" that fall short of breaching the plea agreement. See Riera, 298 F.3d at 135.

But the government addressed the issue of acceptance of responsibility a second, separate time. In response to Griffin's arguments, permitted by the plea agreement, see Plea Agreement, at ¶¶ 8-9, that no relevant conduct was applicable to his sentencing beyond that to which he pleaded guilty, the government wrote that "the defendant is attempting to limit his conduct to

19

only that to which he pled guilty," which "leads the government to question whether the defendant has truly accepted responsibility pursuant to U.S.S.G. § 3E1.1(a)."  Gov't April 15 Response, at 21.  The government then reviewed the legal framework of a downward adjustment for acceptance of responsibility, concluding:  "It is unclear whether the defendant's objections to the inclusion of all the relevant conduct rises to the level of outweighing his acceptance of responsibility.  Suffice it to say that the defendant's objections to the relevant conduct raises [sic] questions on the issue of acceptance."  Id. at 22.

This was well beyond the pale.  No discussion of an acceptance of responsibility adjustment was solicited by the court.  Cf. Riera, 298 F.3d at 134-35.  It was not an effort simply to correct an inaccurate representation of relevant sentencing law.  See Amico, 416 F.3d at 166 ("In view of the defendant's inaccurate description of the law relating to aggravating role, the government was entitled to explain the law concerning this adjustment without violating its agreement.").  Nor did the government merely provide information or evidence in response to any statements by the defendant.  Plea Agreement, at ¶ 18b.  Instead, the government, on its own initiative, warned the court about what it considered to be "troubling" statements by the defendant in his submission to the court in anticipation of sentencing.

20

The government did nothing to retract its questionable statements or otherwise ameliorate their impact. Cf. Amico, 416 F.3d at 165 (noting that "a retraction of an argument advanced by the government in violation of its plea agreement would [not] always cure its breach," but concluding that the "temporary breach" of a "mild, brief, and unassertive form," combined with a "rapid retraction," sufficiently cured any breach). Instead, the government followed up its first statement of misgivings regarding the defendant's objections with both a reiteration of its doubts regarding the defendant's acceptance of responsibility and an unsolicited review of law relevant to denying the adjustment. See Gov't April 15 Response, at 21–22.

The government argues that it adhered to its promise in the plea agreement throughout the sentencing hearing by advocating for a sentence within a Guidelines range that included the downward adjustment for acceptance of responsibility and by expressly stating that it did "not advocat[e] for anything beyond what's in the plea agreement." Sent'g Hrg. Tr, June 21, 2005, at 5, 15. These indirect references to an acceptance of responsibility adjustment do not, we think, effectively retract the previous statements or cure any breach.[7] And we hav

---

[7] Even if we agreed that Griffin "opened the door" during the sentencing hearing by denying relevant conduct that the district court later determined to have occurred, see Amico, 416 F.3d at 165, this would not be relevant to the breach of the plea agreement because the government's sentencing letters were submitted prior to the sentencing hearing and prior to the district court's explicit warnings to Griffin about the perilous nature of his denial of such conduct in light of the guidelines

21

e determined that statements by the government asserting that it did not intend to violate the plea agreement "do not . . . insulate the government against a finding of breach if in fact what was said constituted an argument" that violated the plea agreement.  Vaval, 404 F.3d at 153.  "Given the government's often decisive role in the sentencing context, we will not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness."  Lawlor, 168 F.3d at 637.

This is not to say that the plea agreement required the government to remain silent were the defendant to make statements inconsistent with the government's understandings.  It did not.  But the government did more than correct inconsistencies in fact or law with information or evidence available to it, as permitted by the plea agreement.  Instead, it offered a thorough legal analysis, unsolicited by the court, and concluded by noting its own skepticism as to whether the defendant satisfied the requirements for an adjustment for acceptance of responsibility as set forth by its analysis.

To paraphrase our conclusion in Vaval, 404 F.3d at 153, it is difficult to draw a principled distinction between the government voicing outright opposition to a downward adjustment for acceptance of responsibility and stating that the defendant's conduct was "troubling" and "raises questions on the issue of

pertaining to acceptance of responsibility.  See, e.g., Sent'g Hr'g Tr., May 23, 2005, at 18-20.

22

acceptance." Without expressly opposing such an adjustment, which would have been a more obvious and egregious breach of the plea agreement, the government could have done little more to attempt to persuade the court to deny an adjustment for acceptance of responsibility. After the first letter directly addressing the issue of acceptance of responsibility, "the government's statements served no purpose other than to advocate that the court" deny an adjustment for acceptance of responsibility. Id. at 154.

That the district court disclaimed the government's statements does not alter our conclusion. "Where the sentencing court has sentenced in accordance with a position improperly advocated, while claiming not to have been influenced by the improper advocacy, a reviewing court can do no more than speculate as to whether the judge was in fact influenced, even unconsciously." Amico, 416 F.3d at 168. We therefore conclude that although the government's mistake was a common one made in the course of strongly felt and doubtlessly well-intentioned advocacy, it breached the plea agreement by urging, in effect, that the district court deny a downward adjustment for acceptance of responsibility.

C. The Dissent

Judge Wesley does not dispute that the government was forbidden by the plea agreement from making the statements in its April 15 communication to the district court. And he agrees that "the government[, therefore,] breached [the plea agreement]

23

before the sentencing hearing" took place. Dissent at **[7]**. Neither does he assert that there is, nor can we find, anything in the plea agreement that (1) renders it a breach for the defendant to make a false statement, confirm that he previously made one, or to correct one, or (2) expunges or renders harmless the government's previous breach in the event of any such action by or on behalf of the defendant. See id. at **[9]**. Indeed, the plea agreement explicitly anticipates the possibility of such untruthfulness by reserving for the government the right to "respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government." Plea Agreement at ¶ 18.[8]

Embracing, instead, an argument that the government never made, the dissent is focused on the fact that at the time of the plea hearing -- several months after the government's breach -- "the defendant did not continue to maintain his [previous] denial," dissent at **[7]**, in response to the PSR, as to "knowledge [by him] of the BabyJ video," id. at **[3]**. Griffin "recant[ed], showing that his earlier denials had been untruthful," id. at **[8]**. The dissent would hold that this concession of misstatements by the defendant excuses the

_____

[8] This is not to suggest that the defendant was free to lie with impunity. He was, of course, subject to sanction for testifying falsely, obstructing justice, or perhaps otherwise for proffering untruthful information in this context.

24

government from having failed previously to "strict[ly] compl[y]" with the agreement. Id. at **[10]**. We do not see how. We know of no authority for the proposition that a defendant's concession of previous misstatements during sentencing excuses the government from its previous noncompliance with the plea agreement, nor any theory upon which we think such a proposition could reasonably be based.

This is not a case where the government sought to renounce a plea agreement because the defendant had breached it. See United States v. Cruz-Mercado, 360 F.3d 30, 39 (1st Cir. 2004) (cited by the dissent, at **[9]**). The government flatly and materially breached the plea agreement by advocating against an acceptance of responsibility adjustment. Only now does the dissenter search the record to find a misstatement by the defendant on the basis of which he would have the court bestow a pardon to the government for its breach. Especially in light of our oft-repeated dictum that "courts construe plea agreements strictly against the Government . . . for a variety of reasons, including the fact that the Government is usually the party that drafts the agreement, and the fact that the Government ordinarily has certain awesome advantages in bargaining power," United States v. Ready, 82 F.3d 551 (2d Cir. 1996), we conclude to the contrary that the government was, and remained, bound by its plea agreement and responsible for its material breach thereof.

D. Remedy

The appropriate remedy for a breach of a plea agreement is "either to permit the plea to be withdrawn or to order specific performance of the agreement." Lawlor, 168 F.3d at 638 (citation omitted). The defendant seeks only specific performance here. We therefore vacate the sentence and remand for resentencing.

In doing so, we must remand to a different district judge. Id. Although in most other contexts we resist such a course of action, we have concluded that where a plea agreement is concerned it is appropriate because "the government's breach of its commitment is difficult to erase if the case remains before the same judge, because the judge's decision . . . was based on his assessment of the facts." Id. (quoting Enriquez, 42 F.3d at 772). It is an understatement to observe, in light of the transcript of the proceedings in the district court, that this "disqualification results not from any inappropriate action on [the judge's] part, but by reason of the government's failure to adhere to its contractual obligation." Id. (internal citation omitted). But "the government-rung bell cannot be unrung." Riera, 298 F.3d at 134. If the district court were again to deny acceptance of responsibility, even if such an action is warranted, there is no way to be certain that the government's breach had no effect on that determination. Treating this course of action as a prophylactic rule ensures that the appearance of justice will not be compromised, see United States v. Kaba, 480

26

F.3d 152, 159 (2d Cir. 2007), and, of course, encourages punctilious respect for similar agreements in the future.

We therefore remand to a different judge reluctantly. The district court proceeded with what we view as extraordinary diligence. The hearings it held were unusually lengthy and complex. The extent to which this exemplary effort will be wasted is a matter of no small concern. We conclude nonetheless that we are required to do so by our case law and the principles underlying it.

E. Other Arguments

The defendant makes several additional arguments. Of particular note are his assertions that the government violated Federal Rule of Criminal Procedure 16 and Brady by failing to turn over a copy of his hard drives, and his challenges to the district court's application of sentencing enhancements for trafficking and distribution based on his use of KaZaA. We often address issues raised on appeal that are not central to the disposition of the appeal and might ordinarily be inclined to do so here. On this sentencing appeal, however, we choose to exercise our discretion not to do so for several reasons.

First, subsequent to the sentencing proceedings below, Congress passed a law that requires that "any property or material that constitutes child pornography . . . shall remain in the care, custody, and control of either the Government or the court." Adam Walsh Child Protection and Safety Act of 2006, Pub.

27

L. No. 109-248, 120 Stat. 629, 631 (codified at 18 U.S.C. § 3509(m)(1) (2006)).  This law appears to track closely the government's former policy in that it prohibits the government from providing a copy of any "property or material that constitutes child pornography" to a defendant, notwithstanding the requirements of Rule 16 of the Federal Rules of Criminal Procedure.  Id. § 3509(m)(2)(A).  A defendant or his or her expert may only examine the property at a government facility.  Id. § 3509(m)(2)(B).  Interpretations of this provision have begun to percolate through the district courts but, to the best of our knowledge, no Court of Appeals has yet addressed it.  See generally Adam Liptak, Locking Up the Crucial Evidence and Crippling the Defense, N.Y. Times, Apr. 9, 2007, at A10.  In light of this change in the law subsequent to Griffin's sentence on an issue he raises before us for the first time on appeal, we think it better for the district court to address his arguments under Rule 16 and Brady and to await possible further developments in the law in this regard before addressing it if indeed we eventually must in this case.[9]

Second, despite the lengthy sentencing hearing directed primarily at understanding the use, function, and operation of KaZaA, we find the record to be, through no apparent fault of the

---

[9]  Because we do not address the Rule 16 argument, we need not determine on the present record and at this point whether Griffin requested a copy of the hard drive prior to sentencing as required.

28

court, confused and difficult to follow. The court repeatedly expressed its frustration in this regard. See, e.g., Sent'g Hr'g Tr., June 21, 2005, at 75 ("To the Government, I think you're making this way [too] confusing . . . ."); Sent'g Hr'g Tr., July 13, 2005, at 22 ("In this case, because of issues that have arisen at the fault of the Prosecution and law enforcement, frankly, this is now the fourth day of this hearing. What boggles my mind, I've rarely heard an agent testify as [an FBI] agent did on the stand. He changed a report without indicating it was an amended report."); Id. at 33 ("This is what the case is all about, KaZaA. I can't believe in the FBI somebody doesn't know about KaZaA. It doesn't have to be a live witness [i]f I had an affidavit from somebody explaining to me how KaZaA works . . . ."). Moreover, on remand, the defendant or his expert witness may be afforded an opportunity to inspect the computer hard drives in an effort to complete the record, which may be of benefit to what at least seem on the surface to present complicated technical issues. We think our review of this argument, should we be required to conduct one, would benefit from further exposition and clarification in the district court.

Finally, when remanding for a retrial on the merits, we do, of course, often decide issues that are not strictly before us when they are likely to arise again in the course of the retrial. See, e.g., United States v. Shellef, 2007 WL ----, *?, 2007 U.S. App. LEXIS 25974, *52 (2d Cir. Nov. 8, 2007)

29

(addressing various issues "because they [were] likely to arise again on remand and retrial . . . even though their resolution [was] not strictly necessary in order to decide [the appeal."); United States v. Amico, 486 F.3d 764, 767 (2d Cir. 2007) (vacating the conviction and addressing "only those issues calling for guidance on remand"); United States v. Quattrone, 441 F.3d 153, 182 (2d Cir. 2006) (addressing evidentiary rulings on appeal where conviction was vacated and remanded for retrial based on a flawed jury instruction). Deciding them may save the investment of the substantial judicial resources -- as well as those of counsel and members of another jury -- that might be required by yet another remand should we eventually decide those additional issues contrary to the view of the district court. Yet another complete retrial might well follow. The resources expended, however, tend to be considerably less where, as here, the remand is confined to resentencing and subsequent additional sentencing hearings rather than a subsequent retrial on the merits. Cf. United States v. Leung, 40 F.3d 577, 586 n.2 (2d Cir. 1994) ("Our slightly greater willingness, when there are extenuating circumstances, to entertain sentencing objections that were not presented to the District Court may reflect the different impact on the judicial system engendered by vacating a sentence in comparison with reversing a conviction. Unlike trial errors, whose correction requires a new trial that a timely objection might have obviated, correcting sentencing errors

30

usually demands only a brief resentencing procedure.") (citing United States v. Baez, 944 F.2d 88, 90 n.1 (2d Cir. 1991)).

The remaining subsidiary arguments are also best left for the district court to address in the first instance.

**CONCLUSION**

The case is remanded to the district court with the direction that it be assigned to a different district judge for the court to vacate the current sentence and impose sentence de novo.

31

WESLEY, *Circuit Judge*, dissenting:

The majority concludes that this case should be remanded to a new district court judge for specific performance of the government's promise not to object to defendant's request for an acceptance of responsibility adjustment. It does so in the name of preserving the integrity of the plea bargaining process and public confidence in the federal criminal justice system. I agree with my colleagues that courts must be vigilant in holding the government to its promises. I submit, however, that the majority's analysis overlooks a crucial fact in this case – defendant's own prior breach of the agreement. In my view, remand will seriously undercut the very policy concerns the majority seeks to protect. I therefore respectfully dissent and vote to affirm the judgment.

**The Plea Agreement**[1]

In late November, 2004, defendant pleaded guilty to one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) pursuant to a plea agreement with the government. Plea Agreement at ¶ 1. The plea agreement contained stipulated facts, including defendant's acknowledgment that he had admitted previously to an FBI agent that he had opened downloaded images containing child pornography in a "shared folder" on the KaZaA system.[2] *Id.* at ¶ 7(c). The plea agreement also noted the "defendant['s] state[ment] that in October of 2003, he had opened approximately ten (10) child pornography images obtained through KaZaA." *Id.* The stipulated facts further indicated that defendant did not realize that he had downloaded images containing child pornography, that he deleted six of them, that he was aware that four images remained on his computer, and that he moved two images to his "My Documents" folder. *Id.* at ¶ 7(c)-(d).

---

[1] Defendant has not raised any objection to the adequacy of his plea colloquy or to the knowing and voluntary nature of his consent to the plea agreement.

[2] Judge Sack's opinion describes how KaZaA functions. *See* Maj. at 3.

1

Although there is no mention in the stipulated facts of defendant's possession of a "BabyJ" movie, that movie plays a vital role in this case. The BabyJ movie is part of a series of BabyJ pictures and movies that are graphic and disturbing. They involve a young girl in a number of brutal sexual encounters. The undercover agent who first discovered defendant's use of KaZaA to possess and to share child pornography did so by looking for "underage" video clips on KaZaA and came upon a media file shared by defendant entitled "Babyj12." Thus, possession, use, and familiarity with the BabyJ series were particularly relevant to defendant's ultimate sentence exposure even though his colloquy was silent on the issue.

The plea agreement also reflects the parties' inability to agree upon a number of potential sentencing enhancements under the United States Sentencing Guidelines. For instance, the government maintained (without defendant's agreement) that a trafficking enhancement should apply. *See* Maj. at 5. The government also pressed for several enhancements that would raise defendant's sentence – possessing material involving children; using a computer for the possession, transmission, receipt, or distribution of material; committing an offense that included at least 10, but fewer than 150 images; and distributing images for the receipt, or expectation of receipt, of a thing of value, but not for pecuniary gain. *Id.* Most importantly, the government took the position (also disputed by defendant) that a four-level enhancement should apply for defendant's possession of images containing sadomasochistic conduct. *Id.*

The agreement left enhancement determinations to the district court, and provided that the government would not oppose a downward adjustment for defendant's acceptance of responsibility. Plea Agreement at ¶ 12. The precise effect of that adjustment would, of course, vary depending on the court's ultimate Guideline determination.

Finally, the agreement allowed the government to "respond at sentencing to any statements made by the defendant or on the defendant's behalf that [we]re inconsistent with the information and evidence available to the government; . . . ." *Id.* at ¶ 18(b); *see also* Maj. at 22 (noting "that the plea agreement [did not] require[] the government to remain silent were the defendant to make statements inconsistent with the government's understandings").

## Defendant's Initial Denial of Knowledge

## and the Government's Response

In late March, 2005, defendant's attorney submitted detailed objections (affirmed by defendant) to the presentence report ("PSR"). Those objections focused on the enhancements left open by the plea agreement. Defendant's fourth objection – the objection most relevant here – was to the sentencing enhancement for sadomasochistic content. Defense Objections to Presentence Report, dated March 24, 2005, at 4 ("Def. March 24 Objections"). The basis for that enhancement – sought by the government and recommended by the Probation Officer – was defendant's alleged admission to a government agent, recorded in the FBI's 302 Report, that defendant knew about the BabyJ movie and had a copy of it on his computer. Defense counsel repeated his client's prior denial of any knowledge of the BabyJ file and recalled that defendant previously had "stated, as he does here under oath, that he consistently denied knowing of the BabyJ file." *Id.*

The government's initial response to this objection was generic; it was "troubled by some of the defendant's objections [to the PSR] which seem[ed] to raise questions regarding whether the defendant ha[d] truly accepted responsibility . . . ." Statement of the Government with Respect to Sentencing Factors and Motion Pursuant to U.S.S.G. § 3E1.1(b), dated March 31, 2005, at 1 ("Gov't March 31 Statement"). Two weeks later, the government countered defendant's PSR objections in greater detail. This time, reacting to defendant's factual and legal assertions, the government suggested that defendant was reneging upon his initial acceptance of responsibility by disclaiming any knowledge of the BabyJ video in contradiction to the statements defendant allegedly made to the government agent, and to the government's assertion that defendant's computer contained "almost the entire series of movies involving BabyJ." Government's Response to Defendant's Objections to the Presentence Report, dated April 15, 2005, at 15 ("Gov't April 15 Response").

While acknowledging the parties' right to disagree on the applicable Guideline and any potential enhancements, the government expressed concern that defendant, through his denial of knowledge of the BabyJ files, was "now attempting to distance himself from the other images and movies found in his possession." *Id.* at 20. The government argued that defendant was "distancing

3

himself from the BabyJ movie series by discrediting the way the FBI conducted the interview memorialized in the FBI 302 report and by stating that he had repeatedly told law enforcement that he had 'no idea' what files or movies were on his computer." *Id.* at 21. The government also suggested that defendant was trying to cabin the "relevant conduct" made applicable by U.S.S.G. § 1B1.3(a) for which his sentence could be enhanced for sadomasochistic content. *Id.* Once more, the government "question[ed] whether the defendant ha[d] truly accepted responsibility pursuant to U.S.S.G. § 3E1.1(a)." *Id.* The government then proceeded to discuss how a defendant's untruthfulness with respect to relevant conduct might affect the sentencing judge's conclusion that defendant had accepted responsibility.

**The Sentencing Hearing**

In June and July of 2005, the district court conducted an extensive sentencing hearing that included four days of testimony. During the hearing defendant vigorously contested the government's contentions that he: (1) was aware that a BabyJ file was on his computer,[3] (2) had admitted that fact to the FBI when he was arrested, and (3) had actually viewed those files and searched for other BabyJ files. Indeed, just before the hearings began, defense counsel noted that defendant was aware of the consequences if defendant's denials regarding BabyJ files were not accepted by the court:

> I have gone over the acceptance of responsibility stakes with my client. He understands that if the Court decides that he is not truthful, if he does testify, and I have talked to him about testifying, that if he is not truthful with respect not only to the offense conduct, but also what the Court may deem to be relevant conduct,

---

[3] During the sentencing hearing an FBI agent testified that four computers were found at defendant's house. Sent'g Hr'g Tr. May 23, 2005, at 35. Two computers, however – a Dell and an HP – were the focus of later testimony. As discussed further below, the government was able to show that a BabyJ file on defendant's Dell computer was among those that were file-sharing-enabled. Sent'g Hr'g Tr. July 13, 2005, at 40. As also noted below, defendant later admitted that he may have employed the HP in order to search for, and browse BabyJ files. Defense Counsel Letter to Judge Siragusa, dated July 13, 2005 ("Def. July 13 Letter"). The court found, by a preponderance of the evidence, that defendant had BabyJ files on both the Dell and HP computers. Sent'g Hr'g Tr. July 14, 2005, at 8-10.

that he could lose his acceptance reduction. *The Defendant, from very early on in the course of my recommendations, has indicated to me that he was not aware of these items in the shared folder. . . .* So the Defendant is aware that if he is going to deny involvement with an awareness of the BabyJ file and the other materials in the shared folder, there may be consequences and he is prepared to go forward with that. He has not changed his position. He feels that the agents, while they certainly may not be misrepresenting the facts, misinterpreted what he said and he stands by his position.

Sent'g Hr'g Tr. May 23, 2005, at 24-25 (emphasis added).

Counsel's statement followed an explicit warning from Judge Siragusa (paraphrasing U.S.S.G. § 3E1.1 app. n.1(a)) that the sentence mitigation for acceptance of responsibility could be denied and that defendant faced an enhancement for obstruction of justice if he was untruthful. *See id.* at 20 (warning defense counsel that "there could be issues relating to acceptance of responsibility or an enhancement under 3E1.1 for obstruction of justice"). Judge Siragusa repeated his warning on several subsequent occasions, sometimes renewing his concern that defendant's denials under oath might result in an enhancement for obstruction of justice. *See* Sent'g Hr'g Tr. June 2, 2005, at 4-5 (recalling prior comments on "the danger of losing accept[ance] of responsibility"); Sent'g Hr'g Tr. June 21, 2005, at 7 (noting defendant's denials under oath, and commenting that "[t]he Court wanted to impress upon the Defense that not only does the Defendant risk losing acceptance of responsibility, but also could potentially face an enhancement for obstruction of justice"); Sent'g Hr'g Tr. July 13, 2005, at 4 (paraphrasing U.S.S.G. § 3E1.1 app. n.1(a) and providing defendant with an opportunity "to clarify his position").

In response to defendant's initial denials, and pursuant to the plea agreement provision permitting it to respond to defendant's inconsistent statements, *see* Plea Agreement at ¶ 18(b), the government offered evidence of the search terms used to locate the BabyJ file and other files. *See* Government Letter to Judge Siragusa, dated June 1, 2005, at 2-3 ("Gov't June 1 Letter"). The government put forth this evidence based upon the fact that "defendant provided inconsistent statements and the government is entitled to exercise its rights to respond to those statements with the information available to it." *Id.* at 3.

But defendant's position changed radically during the hearing (even though he never testified). The government was able to establish, without objection from defense counsel, that

5

defendant did have a BabyJ file on his computer and that that file was file-sharing-enabled. Furthermore, as a result of testimony from a defense expert, the court noted during the hearing that defendant had "opened . . . a variant of BabyJ three separate times." Sent'g Hr'g Tr. July 13, 2005, at 44. Moreover, defense counsel admitted that the evidence showed that defendant had viewed one of the BabyJ videos. Thus, the government was able to confirm its account of how defendant came to the government's attention and that defendant lied when he denied knowledge or use of the BabyJ files.

Thereafter, defendant made a startling move not mentioned in the majority's recitation of the facts. In a letter to the district court dated July 13, 2005 – one day before he was sentenced – defendant "corrected" the very statements that had generated the government's earlier responses. The "correction" came after Judge Siragusa gave defendant an opportunity "to clarify his position," and after three prior warnings about the consequences of a false denial. *Id.* at 4. Defendant finally "accept[ed] the Court's invitation to correct his previous statements" and retracted his contention that he had never accessed a BabyJ file: "Defendant acknowledges that during his earlier use of the HP computer . . . , he may have used the search term Baby J and may have browsed several files bearing the Baby J label." Def. July 13 Letter. In addition, defendant acknowledged that, although he had previously denied admitting to the FBI that he recognized and downloaded the BabyJ images, "he may or may not have told agents that he recognized or downloaded this image." *Id.* Defendant went on to say that he simply could no longer recall whether he had made the earlier admission or not. *Id.* In short, after being confronted with evidence that seriously undercut his previous factual assertions, and after repeated warnings from the court, defendant abandoned his earlier denials. In essence, he conceded: (1) facts that made some of the more punitive enhancements a certainty, and (2) that he had indeed been untruthful about relevant conduct.

**Discussion**

Judge Sack has thoughtfully outlined the law of this circuit with regard to claims of a breach of plea agreement. I concur in his analysis and endorse his conclusion that, while the government's initial statement that it was "troubled" by defendant's objections to the PSR was not a breach of the

6

plea agreement, the government reached the tipping point when it "offered a thorough legal analysis, unsolicited by the court, and concluded by noting its own skepticism as to whether the defendant satisfied the requirements for an adjustment for acceptance of responsibility as set forth by its analysis." *See* Maj. at 22. As Judge Sack points out, the government was free to argue that defendant's factual assertions were incredible fabrications and that his legal arguments with regard to the enhancements lacked merit. *Id.* But when the government moved beyond mere factual analysis to offer its views on defendant's entitlement to a downward adjustment for acceptance of responsibility, it crossed into an area it had agreed not to enter.

What relief, then, is due defendant in light of the government's breach and defendant's own false denials? In the majority's view, the choice of remedies is binary – either defendant is entitled to withdrawal of his plea, or he is entitled to specific performance of the plea agreement.[4] *Id.* at 26 (citing *United States v. Lawlor*, 168 F.3d 633, 638 (2d Cir. 1999)). As our case law implies, however, another possibility arises from two of the guiding principles that our precedent teaches in this area. First, contract law doctrine applies to plea agreements. *See id.* at 10 (citing *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002)). Second, "not every breach requires a remedy. Rather, the need for a remedy depends on the 'nature of the broken promise and the facts of each particular case.'" *United States v. Vaval*, 404 F.3d 144, 154 (2d Cir. 2005) (quoting *United States v. Brody*, 808 F.2d 944, 948 (2d Cir. 1986)).

The majority's view – one I share – is that the government breached before the sentencing hearing. Judge Sack goes on to note that, even if (hypothetically) defendant had continued to deny the relevant conduct in question at the sentencing hearing and the district court disbelieved him, "this would not be relevant to the breach of the plea agreement because the government's sentencing letters were submitted prior to the sentencing hearing . . . ." Maj. at 21 n.7. Indeed, since the government's breach occurred before the hearing, a later finding that defendant was untruthful after the government's initial breach – without more – would not render the breach harmless. *See Lippo v. Mobil Oil Corp.*, 776 F.2d 706, 724 (7th Cir. 1985) (Posner, J., dissenting

---

[4] As the majority notes, defendant hopes for specific performance of the plea agreement, rather than a retraction of his plea. *See* Maj. at 26.

7

in part) ("[I]f it is too late to undo the harm, the attempt at cure will not excuse the breach; you cannot cure a disease after the patient has died from it."). In that scenario, the hearing would simply have continued the prior injury caused by the government's implicit argument to the court undermining defendant's acceptance of responsibility. In fact, however, the majority's hypothetical never came to pass.

That defendant did not continue to maintain his denial is not clear from the majority's incomplete recitation of the record. To know that defendant subsequently changed his position fundamentally, a fuller review of the record is required.[5] What that review reflects is the all-important revelation – prompted by the sentencing hearing – that culminated in defendant's last-minute recantation, showing that his earlier denials had been untruthful. In plain language, he confirmed that he had lied from the very beginning. The belated retraction came after Judge Siragusa's explicit warning of the cost of false denial, and after defense counsel's statement that defendant was fully aware that he assumed the risk that his denials might have "consequences." Against this backdrop, Judge Siragusa focused on defendant's "eleventh hour" change of heart in deciding the acceptance of responsibility issue.[6] Sent'g Hr'g Tr. July 14, 2005, at 14. He could not

---

[5] Questions arising from the government's alleged breach of a plea agreement, the majority agrees, "must be carefully studied in context," *United States v. Amico*, 416 F.3d 163, 167 n.2 (2d Cir. 2005), and thus merit "a fact-specific analysis," Maj. at 11-12. For this reason, careful consideration of the full record is all the more crucial in this case.

[6] The Application Notes to the provision of the Sentencing Guidelines governing acceptance of responsibility state (unsurprisingly) that "[i]n determining whether a defendant qualifies" for an acceptance of responsibility adjustment, "appropriate considerations include, but are not limited to," among other things:

> (a) *truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable* under § 1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, *a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility* . . . .

8

have done otherwise, for that was the only evidence remaining before the court relevant to the acceptance of responsibility determination.[7]

This circuit has eschewed a "harmless error" or "lack of prejudice" defense to the breach of a plea agreement by the government, finding the absence of cognizable harm to a defendant irrelevant to the need for remedy. *Vaval*, 404 F.3d at 154 ("Whether a breach by sentence advocacy caused prejudice in the form of an increased sentence is irrelevant to the need for a remedy."). We rightly noted in *Vaval* that "in order to preserve the integrity of plea bargaining procedures and public confidence in the criminal justice system, a defendant is generally entitled to the enforcement of a plea agreement without showing a tangible harm resulting from a breach." *Id.* at 155.[8] I readily agree. Generally, we will not accept the premise that once the government has abandoned a plea agreement promise the sentencing bell can be "unrung." Maj. at 26 (citing *Riera*, 298 F.3d at 134). The stain from a breach is not easily removed; the impression upon the district court lingers, as does the impact upon a defendant (who, at resentencing, may well receive the same sentence as a result). Thus, silencing the government and mandating an acceptance of responsibility determination before a different district judge is sometimes justified "in order to preserve the integrity of plea bargaining procedures and public confidence" that federal criminal justice is not a one-sided affair. *Vaval*, 404 F.3d at 155.

---

U.S.S.G. § 3E1.1 app. n.1(a) (2004) (emphasis added).

The majority makes the curious statement that I have failed to identify a clause in the plea agreement that required Griffin to be scrupulously honest in his statements to the district court. Maj. at 24. I cannot agree with the majority's obvious implication – that the plea agreement did not obligate Griffin to make factual representations to the court that were offered in good faith and were truthful. Were that the case, it would mark a quite radical departure from the contract law's historical requirement of good faith. It would also create a perverse incentive for defendants to lie at no great cost, thereby undermining our plea bargaining system's calculus of rewards and risks.

[7] Defendant does not contest the factual basis for that finding.

[8] *Vaval* recognized two exceptions to the need for a remedy – curative performance by the government and *de minimis* injury arising from the breach. *Vaval*, 404 F.3d at 155-56. Neither is applicable here.

9

But harmless error is not the hook upon which I hang my vote in this case. As with all contractual arrangements, each party has an obligation to operate in good faith, and to rigorously adhere to the obligations outlined in the contract and the law of the governing jurisdiction, from the contract's inception. "[A] defendant is not entitled to the benefit of his bargain if he does not himself comply with the terms of the agreement." *United States v. Cruz-Mercado*, 360 F.3d 30, 39 (1st Cir. 2004). As we have said before, applying contract law principles to agreements between the government and a defendant in the criminal setting, "[t]here is . . . an implied obligation of good faith and fair dealing in every contract." *United States v. Khan*, 920 F.2d 1100, 1105 (2d Cir. 1990) (citations omitted); *see also United States v. Rexach*, 896 F.2d 710, 714 (2d Cir. 1990) (citing *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir. 1980); Restatement (Second) of Contracts § 205); Restatement (Second) of Contracts § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). I am therefore hard pressed to award defendant a remand in light of his acknowledged untruthfulness long before the government's breach. Defendant asks us to hold that the government be held to strict compliance with the plea agreement while ignoring his own admitted deviation from it.[9] Judicial economy, the integrity of the plea bargaining process, and the public's confidence in the federal criminal justice system compel us, in my view, to deny that request.

Returning Mr. Griffin to district court for one more "bite at the apple" will produce an interesting scenario. After his dramatic reversal at the sentencing hearing that was compelled by testimony directly contradicting his initial denials of responsibility, defendant no longer embraces the facts that served as the basis for his earlier objections to the PSR's enhancements calculation.[10] *See* Def. March 24 Objections at 4-5 (objecting to the PSR, and denying that he: (1) knew of the

---

[9] Although the majority is aware of my view that the government did, indeed, breach, *see* Maj. at 23-24, they nevertheless insist that I am attempting to "excuse[]" the government's noncompliance, or to "pardon" it. *Id.* at 25. While I am not willing to either excuse or pardon the government's breach, I likewise believe that the government's noncompliance cannot be examined in a vacuum, without reference to Griffin's own noncompliance.

[10] Nor does defendant argue on appeal that the court's assessment of those enhancements is not supported by the record.

10

BabyJ file, (2) admitted such to the FBI, or (3) downloaded the BabyJ file). Moreover, he can no longer argue, as he attempted to do in his objections to the PSR, that the only conduct relevant to his sentence is that contained in the plea agreement.[11] No doubt, defendant will attempt to make the same argument at resentencing that he made to the district court when he was originally sentenced – that he is entitled to a reduction in his sentence for acceptance of responsibility because that acceptance, however late in coming, was genuine.

The majority concedes that Judge Siragusa conducted an "unusually lengthy and complex" hearing in this case with "extraordinary diligence" and, furthermore, acknowledges that "[t]he extent to which this exemplary effort will be wasted is a matter of no small concern." Maj. at 27. I share the same concern. Indeed, I see no need to repeat the exercise.[12]

Finally, the majority takes the position that the remaining issues defendant raises need not be addressed on this round of appeal as the record could use clarification on the trafficking issue – one of first impression in this circuit – and because there have been some significant legislative developments in the interim with regard to discovery of computer hard drives that contain child pornography. *Id.* at 27-31. Had my view of the case carried the day, I would have been willing to

---

[11] That argument was, of course, specious to begin with, as "relevant conduct" is determined by the Sentencing Guidelines to include, not merely conduct averted to in the "four corners" of a plea agreement, but other conduct related to the charge as well. *See* U.S.S.G. § 1B1.3(a) (permitting a sentence to "be determined on the basis of . . . all acts and omissions . . . that occurred during the commission of the offense of conviction, in preparation for that offense, *or in the course of attempting to avoid detection or responsibility for that offense*" (emphasis added)); *see also* U.S.S.G. § 1B1.4 ("In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law. *See* 18 U.S.C. § 3661.").

[12] As we have recently restated in a different context, "'reassignment to another judge may be advisable in order to avoid an exercise in futility (in which) the Court is merely marching up the hill only to march right down again.'" *United States v. Hirliman*, 503 F.3d 212, 216 (2d Cir. 2007) (quoting *United States v. Robin*, 553 F.2d 8, 11 (2d Cir. 1977) (en banc)). Although the majority's order here is issued to a different district court, this will not likely save the resentencing judge from an unnecessary "march" of his own. Indeed, there is every reason to suspect that the resentencing judge will engage in the same "exercise in futility" that would have awaited Judge Siragusa, had we instead remanded directly to him.

11

resolve all of the issues that remain and affirm the judgment of conviction. As I find myself in the minority, and because my resolution of these other issues would not impact today's result, I refrain from elaborating as to how I would face them. That effort I defer to another panel and to another day, confident that it is not far off.

## Conclusion

For the reasons offered above, I respectfully dissent.