# United States Court of Appeals

## For the First Circuit

No. 03-1077

UNITED STATES OF AMERICA,

Appellee,

v.

JOSE OMAR CRUZ-MERCADO,

Defendant, Appellant.

No. 03-1078

UNITED STATES OF AMERICA,

Appellee,

v.

VICTOR FAJARDO-VELEZ,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Hector M. Laffitte, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Smith,[*] District Judge.

[*]Of the District of Rhode Island, sitting by designation.

Gary H. Montilla with whom Luis A. Plaza, Osvaldo Carlo Linares and Lausell & Carlo, PSC were on brief for appellant Fajardo-Velez.

Ignacio Rivera-Cordero for appellant Cruz-Mercado.

Nelson Perez-Sosa, Assistant United States Attorney, with whom H.S. Garcia, United States Attorney, and Sonia I. Torres-Pabon, Assistant United States Attorney, were on brief for appellee.

March 2, 2004

**COFFIN, <u>Senior Circuit Judge</u>**.  Appellants Victor Fajardo-Velez and Jose Omar Cruz-Mercado were the Secretary and Associate Secretary of the Puerto Rico Department of Education (PRDE) when they devised an extortion and kickback scheme that allegedly involved fraudulent payments of more than $4.3 million in cash and property from PRDE contractors.  Appellants entered into separate cooperation agreements with the government and pled guilty to several counts in exchange for what they hoped would be shorter sentences.  Those hopes were not realized, however, and appellants now raise a series of challenges to their sentences.[1]  Finding no reversible error, we affirm.

## I. <u>Background</u>

We briefly summarize the relevant facts and procedural history, drawing from appellants' cooperation agreements, and from the transcripts of their sentencing proceedings and Fajardo's bail revocation hearing.  <u>See</u> <u>United States</u> v. <u>Mateo</u>, 271 F.3d 11, 13 (1st Cir. 2001).  According to their agreements, Fajardo recruited

---

[1] Fajardo also claims that his plea to Count Five of the indictment, which charged a violation of 18 U.S.C. § 666, should be vacated and the count dismissed because the count as alleged lacked an essential jurisdictional element of the offense.  Section 666 governs theft or bribery involving programs that receive federal funds.  The government agrees that omission of an allegation that the program received more than $10,000 in federal funds in a single year renders the count insufficient, <u>see</u> 18 U.S.C. § 666(b), and concedes that it therefore should be dismissed.  Although Cruz did not raise this issue, the government states that he is entitled to the same action.  Consequently, we direct the district court to dismiss Count Five as to both appellants.

Cruz to collaborate in a scheme to extort money from PRDE contractors initially for the purpose of financing their political party obligations and later for personal purposes. Among other activities, the two administrators orchestrated the creation of a corporation to act as a front for their illegal activities. The corporation, Research & Management Group, Inc., submitted three contract proposals totaling more than $4 million to the PRDE and also generated false invoices seeking payments from other PRDE contractors. Fajardo approved the Research & Management contracts and also awarded contracts to a number of companies whose principals – charged as co-defendants in the indictment – had made payments to appellants. Fajardo and Cruz also ordered that invoices for their political party activities be distributed to various PRDE contractors for payment. In addition to the cash payments extorted from the contractors between 1994 and 2001, appellants received "items for personal use." Hundreds of thousands of dollars in cash were kept in a safe in Fajardo's office, and appellants dipped into it for various political and personal purposes.

Appellants were charged in January 2002 with fifteen co-defendants in an eight-count indictment. In February 2002, both men pled guilty to three counts (Counts One, Five and Eight) pursuant to non-binding plea and cooperation agreements that specified the sentencing calculations that the government would

-4-

recommend and provided that the government would file motions for downward departure if appellants provided substantial assistance in the investigation or prosecution of others. For Cruz, the anticipated recommended sentence was set at 46-57 months; for Fajardo, the recommendation was to be for 70-87 months. Fajardo paid $1,352,000 in restitution before tendering his guilty plea; Cruz agreed to forfeit $600,000, of which approximately $14,700 was paid before his cooperation agreement was signed. Both testified before the Grand Jury and provided considerable information to authorities about their own activities and the activities of others.

In September 2002, Fajardo was called by the government as the first witness at the trial of three co-defendants. On the fifth day of his testimony, during cross-examination, the trial was aborted when the government accused Fajardo of committing perjury and moved to revoke his bond, requesting in addition that the case be dismissed with prejudice as to all remaining defendants (the three on trial as well as ten others). The district court granted the motions. Maintaining that he had been truthful, Fajardo moved for release on bail and also sought enforcement of the government's obligations under the plea agreement. Following a hearing in which the court explored the government's allegations of untruthfulness, see infra at 14-19, the court denied Fajardo's motions.

Sentencing for both appellants took place on December 11, 2002. Without any benefit from their plea agreements, their terms pursuant to the Sentencing Guidelines were roughly twice as long as they had hoped to receive.[2] Fajardo was sentenced to a term of 151 months on Counts One and Eight and 120 months to be served concurrently on Count Five. The court ordered restitution in the amount of $4.3 million. Cruz was sentenced to a term of 132 months on the three counts, with the previously agreed upon forfeiture amount of $600,000. These appeals followed.

## II. Appeal of Cruz-Mercado

Cruz asserts generally that, in light of his substantial assistance to the government, he is entitled to be sentenced in accordance with his plea agreement. Presumably recognizing that the district court was not bound by the agreement, he particularizes that contention by identifying three specific flaws in his sentencing: (1) he was improperly denied a downward departure for substantial assistance; (2) his sentence should not have been calculated based on the total loss alleged in the indictment, $4.3 million; and (3) the court made several statements during sentencing that reflected bias toward him. We address each in turn.

---

[2] The government did not renounce Cruz's agreement, but simply declined to move for a downward departure for substantial assistance. The court, however, refused to accept the agreement and instead imposed sentence without regard to it.

A. <u>Downward Departure</u>. Under Cruz's plea agreement, the government was obliged to move for downward departure under U.S.S.G. § 5K1.1 if prosecutors "determine[d] that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." The agreement also provided that it was "conditioned upon the defendant providing full, complete, truthful and substantial cooperation," and that the government would be released from compliance if the defendant failed "in any way" to fulfill his obligations.

Cruz acknowledged that, in one instance, he did not tell the truth, admitting in a sentencing motion that he had "failed to remember a 1996 check that became important at trial and crucial to the position of the US Attorney." He consequently stipulated to a two-level upward adjustment for obstruction of justice.

Cruz maintains that this single episode does not negate the extensive cooperation he provided, which included substantial testimony before the Grand Jury and delivery of more than 150 incriminating documents. He notes that he would have testified at trial as well had the proceedings not been cut short by the government.

Although it appears that Cruz provided significant assistance in the prosecution of this case, his cooperation agreement explicitly gave the government the authority not to request a downward departure in the event Cruz failed to meet his obligation

to be truthful.  Cruz does not dispute his lack of veracity or the relevance of his untruthfulness, seeking only to minimize its weight in light of his otherwise full cooperation with the government.  Whether or not we agree with the government's judgment not to recommend a downward departure is of no consequence.  In the absence of an unconstitutional motivation or arbitrariness, see United States v. Davis, 247 F.3d 322, 325-26 (1st Cir. 2001); United States v. Doe, 233  F.3d 642, 644 (1st Cir. 2000), and in the face of Cruz's admitted obstruction of justice, the government's decision was within its discretion.  Cf. United States v. Saxena, 229 F.3d 1, 6 (1st Cir. 2000) ("A defendant who has entered into a plea agreement with the government, and himself fulfills that agreement, is entitled to the benefit of his bargain.") (emphasis added); see also Davis, 247 F.3d at 326 (government's burden in defending a decision not to file a substantial assistance motion, "at least where there is a plea agreement," is "modest, only one of production, not of persuasion").

To the extent Cruz separately challenges the district court's denial of his motion for a downward departure under the general departure guideline, U.S.S.G. § 5K2.0, his claim is without merit.  We repeatedly have stated that "departures for substantial assistance must come within the confines of USSG § 5K1.1," United States v. Sandoval, 204 F.3d 283, 285 (1st Cir. 2000), and that a

district court consequently is not empowered to independently grant a departure for that reason under § 5K2.0, see, e.g., Davis, 247 F.3d at 328; Sandoval, 204 F.3d at 285; United States v. Alegría, 192 F.3d 179, 189 (lst Cir. 1999). The court therefore did not err in denying his motion.

B. Calculation of Loss. Cruz maintains that the court improperly utilized the total loss alleged in the indictment, $4.3 million, in calculating his sentence, resulting in an erroneous seven-level increase in his base offense level. See U.S.S.G. § 2S1.1(b)(2)(H).[3] He contends that his sentence should have been based on the amount of loss attributed to him in his plea agreement, $600,000, which would have triggered only a three-level increase.

It is undisputed that Cruz was not personally implicated in the full $4.3 million loss charged in the indictment. At sentencing, however, the district court expressed its view that Cruz and Fajardo were equally culpable "partners in crime." The court also noted that the factual allegations indicated that "the money involved in the conspiracy significantly exceeded the 4.3 million dollars reflected in the indictment," which simply was the amount the government felt it could prove beyond a reasonable doubt. Because of the scope of the scheme and appellant's admitted

---

[3] The district court utilized the November 1, 2000 edition of the Sentencing Guidelines.

obstruction of justice, the court found that it was not bound by the plea agreement and that a sentence at the high end of the applicable range, based on the full $4.3 million, was appropriate. The court noted that there were grounds for imposing an upward departure, but decided against doing so.

Appellate review of a district court's application of the Guidelines typically involves a two-part inquiry: "[W]e scrutinize the district court's legal determinations . . . de novo and check its factual determinations for clear error." Mateo, 271 F.3d at 13. Here, Cruz challenges the court's factual finding that he is accountable for the full $4.3 million loss. We see no clear error in that judgment. Cruz pled guilty to Count One, which charged a conspiracy to interfere with commerce by extortion, in violation of 18 U.S.C. § 1951(a). Although Cruz did not participate in each act allegedly a part of the conspiracy, it is well established that co-conspirators may be sentenced based on all reasonably foreseeable acts of others in furtherance of the conspiracy – i.e., all "relevant conduct" under U.S.S.G. § 1B1.3. See United States v. Laboy, 351 F.3d 578, 582-83 (1st Cir. 2003); USSG § 1B1.3(a)(1)(B). Based on Cruz's extensive involvement throughout the relevant six-year period, as detailed in his plea and cooperation agreement, the court supportably found that he shared responsibility as a partner for the full amount of the loss.

C. <u>Judicial Bias</u>.   Cruz claims that two comments by the district judge, one at his sentencing hearing and the other at Fajardo's bail revocation hearing, reflected bias sufficiently prejudicial to warrant his re-sentencing by another judge.   He points to the judge's comment that Fajardo, Cruz and co-defendant Ruperto Vazquez Lopez "operated like mafiosos," particularly when they allocated among themselves specific percentages of the illegal extortion and kickback proceeds they anticipated collecting.   Cruz also challenges the judge's description of him as the "enforcer" in the conspiracy.

We need not dwell on this issue.   First, Cruz neither objected to these comments nor sought recusal of the trial judge based on partiality, limiting our review to assessing only whether plain error occurred.   <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Arache</u>, 946 F.2d 129, 140 (1st Cir. 1991).   Whatever one's view of the judge's rhetoric, we think it beyond debate that it reflected a fact-based assessment of the type of conduct in which the defendants engaged and not a fundamentally unfair bias toward Cruz.

> [J]udicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.  They <u>may</u> do so if they reveal an opinion that derives from an extrajudicial source; and they <u>will</u> do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

Liteky v. United States, 510 U.S. 540, 555 (1994) (emphasis in original).  The remarks here reveal neither, and Cruz's claim is thus unavailing.

### III. Appeal of Fajardo-Velez

Following an evidentiary hearing to explore the government's allegations that Fajardo had committed perjury and breached his plea agreement, the district court found that he was not entitled to enforcement of the agreement and subsequently concluded that his lack of truthfulness warranted an upward adjustment in his sentence for obstruction of justice.  Fajardo claims that he must be re-sentenced because it was the government – not he – who breached the agreement, and because the court's imposition of a harsh sentence stemmed from violations of his Fifth and Sixth Amendment rights.

The constitutional claims primarily arose from the district court's requirement that Fajardo answer a series of questions on cross-examination at his co-defendants' trial after he had invoked the Fifth Amendment, without first allowing him to consult with his attorney.[4]  The questions concerned a company created by his wife and for which he served as board president, "Community Services Training Institute" ("Community"), that was largely unconnected

---

[4] Fajardo makes a general, undeveloped claim that he was denied his Sixth Amendment right to counsel based on the district court's repeated admonition during his trial testimony that he not speak to anyone, including counsel, about the case.  The only time he asked to speak with counsel, however, related to a matter not at issue on appeal, and we therefore do not further address this contention.

-12-

with the charged conspiracy but was the subject of a pending local investigation. It was Fajardo's answers to those questions, which sought to link Community with Research & Management (the company formed to implement the extortion scheme), that prompted the government's allegations of perjury and, in large part, triggered dismissal of the case. The government acknowledges that the testimony elicited after Fajardo invoked his Fifth Amendment rights was "improperly received," but it correctly points out that Fajardo's statements about Community ultimately played no role in his sentencing. The district court relied on other factors to conclude that Fajardo had breached the plea agreement and obstructed justice, and we therefore need not address the substance of the constitutional claims.

Instead, we consider the three instances of untruthfulness on which the district court did rely – which we will detail shortly – and conclude that the court did not err in finding that Fajardo breached the plea agreement.[5] As we explain below, however, we are troubled by the manner in which the government achieved this result. We begin our discussion with some additional procedural background.

---

[5] We review a district court's factual findings concerning a plea agreement only for clear error, but "whether [undisputed] conduct constituted a breach of the plea agreement is a question of law subject to plenary review," United States v. Doe, 233 F.3d 642, 643-44 (1st Cir. 2000); see also United States v. Frazier, 340 F.3d 5, 9-10 (1st Cir. 2003).

Shortly after the co-defendants' trial was terminated and Fajardo's bail was revoked, an evidentiary hearing – labeled a "revocation hearing" – was held to determine if he had been properly returned to custody. The parties addressed the alleged perjury concerning Community and, for the first time on the record, the government identified three additional instances of untruthfulness that it claimed justified withdrawal of the plea agreement, supported an enhancement for obstruction of justice, and contributed to the decision to end the trial and dismiss the case against the remaining defendants.

At the end of the hearing, the court ordered Fajardo's continued detention. A month later, the court issued an order finding that the government had met its burden of proving by a preponderance of the evidence that Fajardo had substantially breached his obligation under the plea agreement "'to provide truthful, complete and accurate testimony and information.'" See United States v. Tilley, 964 F.2d 66, 71 (1st Cir. 1992). The court thus released the government from its obligations under the agreement. The court based its decision on the three alternative incidents of alleged untruthfulness, declining to address whether Fajardo's testimony on Community constituted perjury.

The court relied on the following discrepancies: (1) Fajardo's acknowledgment on cross-examination that he had committed criminal acts before 1994, the year he became Secretary of Education,

-14-

allegedly contradicted a prior statement to prosecutors that his criminal activity began when he assumed that position; (2) his testimony that a co-defendant contractor had financed a trip to Chicago conflicted with subsequently obtained documentary evidence showing that Cruz had reimbursed the contractor for the expenses; and (3) his testimony on cross-examination indicating that the co-defendant contractors participated in the scheme under economic duress allegedly differed from earlier statements to prosecutors that the contractors were collaborators in a mutual business undertaking.

Fajardo claims that, because the government was unable to substantiate the alleged perjury regarding Community, it contrived these three inaccuracies as an alternative way to make him the scapegoat for its flawed investigation and prosecution. He complains that these "vague and unannounced" allegations "blind-sided" his counsel at the revocation hearing. Moreover, he maintains that none of the three claims has merit.

On the alleged contradiction regarding the use of economic duress against the contractors, Fajardo asserts that he testified truthfully in response to technically framed questions that mirrored the language of the indictment, his plea agreement and the charging statute.[6] Any problem, he insists, is attributable to the

---

[6] Count One of the indictment alleged a "conspiracy to interfere with commerce by extortion induced by economic fear and/or color of official right," in violation of the Hobbs Act, 18

-15-

government's ill-conceived case; at the revocation hearing, his attorney observed that bribery might have been a more appropriate charge than one requiring fear of economic harm. Moreover, Fajardo points out, he was denied any opportunity to explain his answers – and, indeed, the government acknowledged at the revocation hearing that it initially anticipated being able to rehabilitate Fajardo on the issue of duress on redirect. See infra at 17.[7] As for payment of the Chicago expenses, Fajardo discounts the importance of any error in his recollection of that one particular trip in light of the contractor's payments on his behalf on other occasions. And on the pre-1994 crimes, Fajardo asserts that he again was not given an opportunity to explain his answer and notes that such crimes may have been only "irrelevant juvenile or petty offenses."

At the revocation hearing, the government denied any attempt to ambush Fajardo's counsel. The prosecutor stated that counsel

U.S.C. § 1951. Under the statute, "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). In cross-examination, when asked if the requests for funds from the contractors were made "with the threats that if they didn't make them, it would be economic death," Fajardo replied, "Yes, sir." This reply was one of several acknowledging that consent from the contractors was "wrongfully induced by fear of economic harm."

[7] Presumably, the government would have pursued its theory that the contractors initially were the victims of economic duress, but later became willing participants, and thus aiders and abettors, in the scheme. Whether or not this is a viable theory is not before us.

-16-

previously had been told of the government's other untruthfulness concerns, and he explained that those issues had not been highlighted in advance of the hearing because the government had been asked specifically to identify and substantiate only its perjury allegations – not instances of untruthfulness outside the courtroom.  Because the government assumed that Fajardo's trial testimony on the three additional matters was true, and that his earlier statements, during debriefing sessions, had been false, the government viewed the incidents as involving untruthfulness, but not perjury.[8]

The prosecutor also explained in some detail how these three matters affected the government's view of the viability of its case.  Initially, he reported, the government had been taken aback by Fajardo's answers on cross-examination indicating that the contractors were threatened with "economic death" if they did not cooperate.  The prosecutor reported that he phoned his supervisors during the next recess to alert them to the problem and was instructed to try to rehabilitate Fajardo on redirect.

According to the prosecutor, however, that plan fell apart in the face of several developments affecting Fajardo's credibility.

---

[8] We note that, unlike the cross-examination testimony on economic duress and prior crimes, which differed from what the government claimed it was earlier told, Fajardo's testimony about the Chicago trip apparently matched the government's expectations. It differed, however, from the documentary evidence produced by co-defendant's counsel and thus presumably should have been viewed as false testimony by the government.

First, to the government's surprise, Fajardo invoked the Fifth

Amendment to avoid answering questions about his activities with

Community.[9]  The prosecutor noted that "[h]e never told us he was

going to have a problem with any questions concerning this matter."

Then, Fajardo admitted that he had committed crimes before 1994;

his exchange with co-defendant's counsel, reproduced in relevant

part below, suggests that such activity was not trivial:

> COUNSEL: Now, you had done prior illegal activities, didn't you, before the facts that are detailed in the indictment, weren't you?
> FAJARDO: Such as, sir?
> COUNSEL: I'm asking you, were you or were you not involved in any illegal activities prior to 1994, 1995?
> FAJARDO: If I were to answer yes or no, that would require an explanation.
>
> Fajardo was then directed by the court to answer yes or no.
>
> FAJARDO: My answer is yes, sir.
> COUNSEL: In other words, you're telling this jury that prior to 1994, you were involved in other illegal activities; is that correct?
> FAJARDO: Yes, sir.
> . . .
> COUNSEL: It involved illegal activities between you and Omar Cruz; is that correct?  Yes or no.
> FAJARDO: Specifically Jose Omar Cruz?
> COUNSEL: Yes.
> FAJARDO: Right now, I don't know.
> COUNSEL: You don't recall?
> FAJARDO: I don't recall.

---

[9] Although the court initially allowed Fajardo to deflect the questions about Community, the court later required him to answer, and his responses triggered the government's allegations of perjury.  As noted earlier, however, that testimony was not a factor in the court's disposition.

Counsel then continued by asking Fajardo if his wife was involved in those activities, and Fajardo replied, "In order to say yes, I need to acknowledge what it is that we're talking about." Then, when asked what he did illegally before 1994, he replied, "[I]t depends on what you consider to be illegal, I may not consider it to be illegal." Counsel then asked if the activities involved Community, and Fajardo said, "I cannot answer that question categorically." The exchange continued with more questions about Community, to which Fajardo at times replied by invoking his Fifth Amendment right not to answer.

Fajardo's admission of earlier criminal activity was particularly troublesome for the government because the exchange with counsel allowed an inference of involvement by Cruz, the government's other key witness. And the final inconsistency – the matter of who paid for the Chicago trip – similarly impacted the credibility of both Fajardo and Cruz. Both had attributed payment for most of the trip's expenses to the contractor, but Cruz's reimbursement check to the contractor's business proved otherwise.

The government asserted at the revocation hearing that the cumulative effect of the three discrepancies, together with the alleged perjury concerning Community, prompted its decision to end the trial and dismiss the case against the remaining defendants, and also provided ample support for the decision to renounce

Fajardo's plea agreement based on a breach of his obligation to provide truthful information.

When it enters into a plea agreement, the government must carry out the obligations it undertakes at least with the diligence it would bring to any contract. United States v. Frazier, 340 F.3d 5, 11 (1st Cir. 2003). Technical compliance is not enough; "[o]ur case law prohibits 'not only explicit repudiation of the government's assurances, but must in the interests of fairness be read to forbid end-runs around them.'" Id. at 10 (quoting Saxena, 229 F.3d at 6). As we noted with respect to Cruz, however, a defendant is not entitled to the benefit of his bargain if he does not himself comply with the terms of the agreement. See Saxena, 229 F.3d at 6.

Before we begin our analysis, we think it important to place in perspective the proper characterization of the breach issue. Fajardo suggests that any transgression on his part must be important enough to justify nearly a doubling of his expected sentence from roughly six or seven years to about twelve-and-one-half years. What he overlooks is that the sentence he received was what the guidelines normally would prescribe for the crimes he committed, albeit with a two-level increase for obstruction of justice.[10] Only fidelity to his cooperation agreement, fulfilling

---

[10] Fajardo was assigned base offense level 32, with Criminal History Category I, which resulted in a guideline sentencing range of 121 to 151 months. Without the obstruction of justice increase,

all that the government reasonably could expect, entitled him to the government's recommendation that the court halve the prison term that otherwise could be imposed.  It is with this perspective that we examine the record.

We are satisfied that the government had a sufficient basis, without relying on the alleged perjury concerning Community, for finding a breach by Fajardo.  While at least one of the government's examples of untruthfulness – the Chicago expenses – seems a minor dereliction and, thus, an inadequate basis for renouncing the plea agreement, and the seeming inconsistency on the role of the contractors may have been more semantics than contradiction,[11] we are still left with the unexplained admission that Fajardo committed crimes – perhaps with Cruz – prior to 1994. At the revocation hearing, the prosecutor termed the failure to disclose prior crimes "crucial" and "a breach of the Plea Agreement, per se."

The record on that issue is far from ideal.  At the revocation hearing, the government supported its claim that Fajardo previously had lied about his pre-1994 activities by pointing to the list of prior bad acts it had provided to co-defendants pursuant to a July

_____

his sentencing range would have been 97 to 121 months.  <u>See</u> U.S.S.G. ch. 5, pt. A (Sentencing Table).

[11] We so describe this issue because, as noted earlier, <u>see</u> <u>supra</u> note 7, the government might have been able to proceed with its theory of the case by clarifying that the economic duress occurred at the outset of the scheme.

2002 court order. The government stated that, based on Fajardo's representations, the list did not include any pre-1994 activity. The list itself, and any evidence of communication from Fajardo underlying it, should have been a part of the record on appeal in this case.

Other factors, however, persuade us that this gap is not fatal to the government's effort to use the inconsistency on pre-1994 offenses as a basis for breach of the plea agreement. Although Fajardo points to the lack of information on the nature of his earlier conduct, and speculates that it may have been minor, the exchange with counsel quoted above permits the inference that, like the scheme at issue in this case, it involved illicit business dealings. These other offenses were, quite clearly, not minor peccadillos. In addition, Fajardo neither denies the conflict in his statements nor offers clarification about the actual nature of such crimes. Moreover, his counsel neither sought a continuance of the revocation hearing to develop information about the crimes nor, so far as the appellate record indicates, moved for reconsideration on that basis following the court's order. Every indicator, therefore, points toward a conclusion that Fajardo misrepresented significant past criminal activity.

The substance and manner of Fajardo's testimony regarding his earlier, previously undisclosed criminal activity cannot be dismissed as trivial. In the first place, the list of prior bad

acts supplied by Fajardo had been given to co-defendants, who would thus now have concrete proof for the jury of misrepresentation by the government's key witness. In the second place, this stain on his credibility was worsened by his effort on multiple occasions during cross-examination to avoid direct answers to questions.[12] In the third place, the earlier quoted colloquy regarding his past crimes indicates that Fajardo's less-than-forthcoming conduct was not simple lapse of memory. And, finally, the bland and evasive response regarding possible illegal activities with Cruz allowed the inference that Cruz participated in the earlier criminal conduct as well, devaluing Cruz's still-to-come testimony.

------

[12] Another example of Fajardo's sidestepping the specific question asked occurred during the exchange with counsel about whether the contractors were under duress:

COUNSEL: And you knew, sir, that when you threatened contractors with no contracts, those contractors whose sole business was to provide educational services and products, you were threatening them with death, weren't you, sir?
FAJARDO: That's an opinion, sir.
    COUNSEL to COURT: May I have an answer to that question, Your Honor?
    COURT: You mean economic death?
COUNSEL: Economic death, sir.
FAJARDO: Yes, sir.
. . .
COUNSEL: And you knew by the threats that you were communicating to those contractors, you were, in essence, threatening them with harming their employees and their employment, didn't you, sir?
FAJARDO: Nobody complained when they were asked for the money. Therefore, they would be the ones to give you the answer.

For these reasons, we conclude that the government reasonably could treat Fajardo's dissembling on his past criminal activities as a matter of considerable consequence in the jury's assessment of his credibility – and a substantial breach of the plea agreement. We thus see no basis for disturbing the district court's sentencing judgment as to Fajardo.

At the same time, however, the government must be chastised for the manner in which it achieved this result. The trial transcript makes clear that Fajardo's testimony on Community – which the government viewed as perjury – was the primary basis for the decision to terminate the trial and seek revocation of Fajardo's bail. It is equally apparent from the transcript of the revocation hearing that Fajardo's counsel reasonably had the impression that the government would be relying at the hearing only on that alleged perjury to support the actions it had taken, including its announced renunciation of the plea agreement. By failing to provide explicit and complete notice of its intentions for the hearing, the government was considerably less forthcoming than the circumstances warranted. In short, providing advance information only about matters the government technically considered perjury, omitting its other untruthfulness concerns, was unnecessarily misleading.

We do not doubt the government's representation that the additional untruthfulness issues, though unmentioned at the time,

played a role in its decision to dismiss the case.  Nor do we think the lack of notice materially affected Fajardo's ability to defend against the government's claims (especially given the absence of any motion by Fajardo for a continuance).  Nonetheless, in light of the implied obligation of good faith and fair dealing that guides the relationship of the parties in a plea agreement, see Frazier, 340 F.3d at 11, the government should have informed Fajardo's counsel that it intended to broaden the justification for renouncing the agreement beyond what had been articulated at trial and in pre-hearing filings.  Its failure to do so did not deprive Fajardo of any promised benefit – his own untruthfulness did that[13] – but it triggered unnecessary confusion and raised legitimate concerns about the government's conduct.  The government in the future must make every effort to be more responsible in its communications.

Affirmed in part, vacated in part, and remanded to the district court for an order dismissing Count Five as to both appellants.

_____

[13] In fact, Fajardo's sentence may well have been unaffected by his breach of the agreement; the district court stated at Fajardo's sentencing hearing that "regardless of the untruthfulness . . . I would not have accepted this Plea Agreement."