05-4016-cr
United States v. Griffin

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2006

(Argued: December 19, 2006    Decided: December 20, 2007
                                Errata Filed: January 22, 2008)
                   Docket No. 05-4016-cr

-------------------------------------

UNITED STATES OF AMERICA,

Appellee,

- v -

MICHAEL J. GRIFFIN,

Defendant-Appellant.

-------------------------------------

Before:   POOLER, SACK, and WESLEY, Circuit Judges.

The defendant-appellant, Michael Griffin, pleaded guilty, pursuant to a plea agreement, in the United States District Court for the Western District of New York (Charles J. Siragusa, Judge), to one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B), after unlawfully downloading pornographic images to his computer using a peer-to-peer file-sharing program.  The defendant appeals from the portion of the judgment of conviction sentencing him principally to 120 months' imprisonment, arguing, inter alia, that the government breached the parties' plea agreement by advocating against an acceptance of responsibility adjustment.

Remanded for resentencing by another judge.  Judge Wesley dissents in a separate opinion.

BRUCE R. BRYAN, Syracuse, NY, for Defendant-Appellant.

TIFFANY H. LEE, Assistant United States Attorney (Terrance P. Flynn, United States Attorney for the Western District of New York, of counsel), Rochester, NY, for Appellee.

SACK, Circuit Judge:

While there are aspects of this case that may implicate complicated and difficult issues at the unhappy intersection of computer technology and child pornography, we need not, and therefore do not, address them.  The resolution of this appeal hinges on the narrow question of whether the government adhered to the terms of the plea agreement between it and the defendant during sentencing proceedings.  Because we conclude that the government breached the plea agreement, we vacate the sentence and remand for resentencing by another district judge.

**BACKGROUND**

On November 23, 2004, the defendant pleaded guilty pursuant to a written plea agreement to one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).  By pleading guilty, he admitted that he "knowingly possessed material that contained images of child pornography . . . [that] had been . . . transported in interstate . . . commerce by any means, including by computer . . . ."  Plea Agreement of Michael J. Griffin, dated November 23, 2004, in the United States

2

District Court for the Western District of New York, at ¶ 6 (the "Plea Agreement").

This prosecution arose out of an FBI investigation involving the defendant's use of a peer-to-peer file sharing program called KaZaA (sometimes spelled "kazaa"). Broadly speaking, KaZaA is a computer program, downloaded to a computer, that allows the computer's user to share and obtain, via the Internet, many types of digital files, including photographs and video recordings. The program enables the user to create and maintain a "shared folder" ("KaZaA Shared Folder") on his or her computer's hard drive which, when enabled, allows other users to download files located in that KaZaA Shared Folder onto their own computer's hard drive. A KaZaA user can enable a feature in the program called "sharing disabled" which prevents other KaZaA users from downloading any file from the original user's computer, even if the file is located in the latter's KaZaA Shared Folder. While the "sharing disabled" feature is enabled on a KaZaA user's computer, however, he or she cannot download files from other KaZaA users.[1]

---

[1] See also United States v. Sewell, 457 F.3d 841, 842 (8th Cir. 2006) (describing how KaZaA works and noting that after an individual "downloads" a file from another user's shared folder, "[t]he downloaded file will automatically be placed in the user's [KaZaA] Shared Folder to be searched and downloaded by other users unless the local user disables this feature"). See generally Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd., 380 F.3d 1154, 1158–59 (9th Cir. 2004) (describing mechanics of peer-to-peer file sharing software), vacated and remanded, 545 U.S. 913 (2005).

3

In the plea agreement, Griffin admitted that in October 2003, he had opened approximately ten child pornography images acquired using KaZaA and had deleted six of the images, but that at least four of the images remained on his computer's hard drive. He further acknowledged that he moved two of these images into the "My Documents" folder on his hard drive, and that one of these images depicted a minor under the age of twelve years old. During the plea colloquy before the district court, the government explained that it had not given, and would not give, the defendant a copy of his computer's hard drive, which it had confiscated in accordance with its policy of treating hard drives containing child pornography as contraband, but that the defendant and his representatives could view the images in the government's offices.

The plea agreement left unresolved a variety of disputes between the government and Griffin concerning the application of the United States Sentencing Guidelines, including the proper determination of the defendant's adjusted offense level and the application of several possible enhancements. In order to address these disputes, the district court held an evidentiary hearing that took the better part of four days during June and July 2005. The hearing included testimony from several computer forensic experts on behalf of the government and one on behalf of the defendant. Testimony at these hearings focused on the contents of the defendant's computer hard drives, the initial FBI report produced after the defendant first was interviewed

4

following a search of his home and seizure of his computers, and the operation of KaZaA.

The district court adopted the recommendation of the Probation Office and the government as to the calculation of the Guidelines sentence. It is undisputed that the defendant's base offense level was fifteen. Based on the defendant's use of KaZaA, the district court then applied a cross-reference for "trafficking," which added two levels, United States Sentencing Guidelines Manual ("U.S.S.G.") § 2G2.2(c)(1), and increased the offense level by an additional five levels for distribution with the expectation of receipt of a thing of value, but not pecuniary value, id. § 2G2.2(b)(2)(B). The district court also applied three more two-level enhancements -- for the use of a computer, id. § 2G2.2(b)(5), possession of a photograph of a minor under the age of twelve, id. § 2G2.2(b)(1), and possessing more than 10 but fewer than 150 images, id. § 2G2.2(b)(6)(A) -- and a four-level enhancement for possession of photographs that included sadistic or masochistic conduct, id. § 2G2.2(b)(3). This resulted in an adjusted total offense level of thirty-two.

The defendant had no previous criminal record, so his criminal history fell within category I. The applicable advisory Guidelines range was therefore 121 to 151 months. The district court sentenced Griffin to the statutory maximum sentence of ten years' (120 months') imprisonment. The district court also imposed a life term of supervised release, which included requirements that the defendant register as a sex offender in

5

whichever state in which he lives and that he be subject to searches of his person or property for the duration of the term of supervised release.

### Acceptance of Responsibility

In the plea agreement, the government agreed "not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines §3E1.1(a) (acceptance of responsibility) and further agree[d] to move the Court to apply the additional one (1) level downward adjustment of Guidelines §3E1.1(b)." Plea Agreement, at ¶12. However, the agreement also permitted the government to "respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government." Id. at ¶18b.

Prior to sentencing, the defendant submitted his objections to the initial Presentence Investigation Report ("PSR"), which outlined Griffin's sentencing arguments, including his objections to many of the Guidelines enhancements discussed above. See Defendant's Response to Presentence Investigation Report, dated March 24, 2005 ("Def's March 24 Response"). Of particular note, Griffin argued that the feature of his KaZaA program that disabled its file-sharing capability remained active nearly all of the time, which counseled against applying a cross-reference for trafficking and a further enhancement for distribution. Id. at 3. He further contended that he was an

6

inadvertent child-pornography user because the PSR identified only eight of more than 4,500 images on his computer as depicting minors.  Id.  Griffin also asserted that there was no proof that he knowingly possessed a particularly lewd and notorious video that prompted the application of a four-level enhancement for sadistic or masochistic conduct.  Id. at 4-5.  The apparent overarching objective of the defendant's objections was to narrow the conduct underlying sentencing to that which Griffin had admitted in the plea agreement.

In a letter to the district court following the receipt of the defendant's objections to the PSR, the government wrote:

> [T]he government is troubled by some of the defendant's objections which seem to raise questions regarding whether the defendant has truly accepted responsibility . . . . However, the defendant did timely notify authorities of his intention to enter into a guilty plea, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently.
>
> If the Court finds that the defendant is entitled for [sic] the two-level downward adjustment pursuant to Guidelines §3E1.1(a) for clearly demonstrating acceptance of responsibility, the government submits that the defendant, based on his actions in promptly entering a guilty plea, would be entitled to the further one-level decrease pursuant to § 3E1.1(b).

Statement of the Government with Respect to Sentencing Factors and Motion Pursuant to U.S.S.G. § 3E1.1(b), dated March 31, 2005, at 1-2 ("Gov't March 31 Statement").

7

The government elaborated on its views in its subsequent sentencing brief.  There it said that it found "troubling . . . the fact that the defendant is now attempting to distance himself from the other images and movies found in his possession."  Government's Response to Defendant's Response to the Presentence Report, dated Apr. 15, 2005, at 20 ("Gov't April 15 Response").  The defendant's conduct therefore "le[d] the government to question whether the defendant has truly accepted responsibility."  Id. at 21.  The government brief also synthesized cases and commentary related to acceptance of responsibility, noting that "while a guilty plea combined with truthful statements about the defendant's offense and other relevant conduct is 'significant evidence' of acceptance of responsibility, 'it can be outweighed by conduct that is inconsistent with acceptance of responsibility.'"  Id. at 21–22 (quoting United States v. Ortiz, 218 F.3d 107, 108 (2d Cir. 2000) (per curiam)).  The government concluded:

> It is unclear whether the defendant's objections to the inclusion of all the relevant conduct rises to the level of outweighing his acceptance of responsibility. Suffice it to say that the defendant's objections to the relevant conduct raises [sic] questions on the issue of acceptance.

Id. at 22.[2]

---

[2]  The government also noted that it did not object to the defendant's arguments that the disputed Guidelines enhancements did not apply and was well aware of the defendant's intent to disagree on these points.  Gov't April 15 Response, at 20.

The district court thereafter made the following determination:

> While the Government, for purposes of the plea, agreed not to oppose a recommendation that I reduce your offense level by a total of three for acceptance of responsibility, I have found otherwise. The Government has not taken any position on that and they have not opposed it. On its own, based on the posture of this case and finding of facts, the Court has denied that.

Sent'g Hr'g Tr., July 14, 2005, at 29.

The defendant now challenges his sentence on several grounds: (1) The government's refusal to provide to him a copy of the confiscated computer hard drives constitutes a violation of Rule 16 of the Federal Rules of Criminal Procedure and Brady v. Maryland, 373 U.S. 83 (1963); (2) the district court's determination that he trafficked and distributed child pornography through his use of KaZaA; (3) the district court's denial of a downward adjustment for acceptance of responsibility; (4) the government's alleged breach of the plea agreement by encouraging the district court to deny an adjustment for acceptance of responsibility; (5) the propriety of the term and provisions of his supervised release; and (6) an alleged violation of the Constitution's Ex Post Facto Clause. Because we conclude that the government breached the plea agreement, which, in this case, requires remand for resentencing de novo, we decline to address the defendant's other arguments.

**DISCUSSION**

I. Breach of the Plea Agreement

9

## A. Legal Standard and Standard of Review

We review interpretations of plea agreements <u>de novo</u> and in accordance with principles of contract law. <u>United States v. Riera</u>, 298 F.3d 128, 133 (2d Cir. 2002) (citing <u>United States v. Padilla</u>, 186 F.3d 136, 139 (2d Cir. 1999)). "To determine whether a plea agreement has been breached, we 'look[] to the reasonable understanding of the parties as to the terms of the agreement.'" <u>Id.</u> (quoting <u>United States v. Colon</u>, 220 F.3d 48, 51 (2d Cir. 2000)). "Because the government ordinarily has certain awesome advantages in bargaining power, any ambiguities in the agreement must be resolved in favor of the defendant." <u>Id.</u> (citations and internal quotation marks omitted). Where plea agreements are involved, the government must take particular "'care in fulfilling its responsibilities.'" <u>United States v. Lawlor</u>, 168 F.3d 633, 637 (2d Cir. 1999) (quoting <u>United States v. Brody</u>, 808 F.2d 944, 948 (2d Cir. 1986)).[3]

Because the defendant did not argue in the district court that the government breached the plea agreement, the government asserts that we must review the argument for plain error. We have held to the contrary that "a defendant is not

---

[3] The statement in <u>Lawlor</u> is that the government must "take <u>much greater</u> care in fulfilling its responsibilities." <u>Lawlor</u>, 168 F.3d at 637 (emphasis added). The context of the statement in the opinion from which this repeated admonishment first emanated suggests that "much greater" means "much greater than the government in fact exercised." <u>See United States v. Januszewski</u>, 777 F.2d 108 (2d Cir. 1985), <u>cited in</u> <u>Brody</u>, 808 F.2d at 948.

required to object to the violation of a plea agreement at the sentencing hearing." Lawlor, 168 F.3d at 636 ("Lawlor's claim [that the government breached the plea agreement] is not barred by his failure to raise this issue with the District Court, nor are we bound to apply a plain error standard of review."). The defendant need not demonstrate that any error as to the government's compliance with his plea agreement satisfies plain error review.

B. The Government's Breach

Whether the government breaches a plea agreement by making allegedly impermissible comments to the sentencing court has been the subject of substantial discussion in this Circuit. Our cases have not yielded a bright-line rule as to the leeway the government has with respect to what it tells the court while operating under such an agreement. "[The] circumstances must [therefore] be carefully studied in context, and where the government's commentary reasonably appears to seek to influence the court in a manner incompatible with the agreement, we will not hesitate to find a breach, notwithstanding formal language of disclaimer." United States v. Amico, 416 F.3d 163, 167 n.2 (2d Cir. 2005).

Amico, upon which the government exclusively relies,[4] contains our most recent application of such a fact-specific

---

[4] The government refers to the case as United States v. Peters. Peters was the sole appellant in the appeal. But Amico was the first named defendant in the official caption of the case, and we therefore refer to it using his name.

11

analysis. There, the defendant-appellant made several arguments to support his contention that the government had breached its plea agreement with him.

First, the defendant-appellant argued that the government's statement that it "adopts the findings of the revised Presentence Investigation Report" violated the plea agreement insofar as this endorsement advocated, by reference, the imposition of a higher sentence than that to which the parties agreed. Id. at 165. Once notified of this violation, however, the government filed an amended statement explaining that it expressly did not advocate the additional enhancements, and it reiterated that position several times thereafter. Id. We noted that "a retraction of an argument advanced by the government in violation of its plea agreement would [not] always cure its breach," but concluded that, "upon careful examination of all the circumstances, especially the mild, brief, and unassertive form of the statement and its rapid retraction, . . . the temporary breach was adequately cured." Id.

Second, the defendant-appellant argued that a government memorandum of law, submitted in response to his objections to the Presentence Investigation Report, violated the plea agreement by advocating a position on an issue about which the plea agreement did not permit discussion. We rejected the argument, concluding: "[The defendant-appellant] opened the door to this response when he attempted to characterize the criminal scheme in a manner favorable to himself, minimized the importance

12

to the criminal scheme of the mortgage brokers, and claimed not to have known supporting documentation accompanying the loan applications was false." Id. Moreover, the government's discussion of the state of the law in response to the defendant-appellant's "inaccurate description of the law" was considered an appropriate response that was permitted by the agreement, particularly because it was surrounded by several statements to the effect that the government did not intend to advocate the imposition of the additional enhancement. Id. at 166.

Similarly, in Riera, the prosecution and the defense agreed that "neither party will seek . . . a departure," and that neither party will "suggest that the Court sua sponte consider such a departure." 298 F.3d at 133–34. The plea agreement also permitted the parties to respond to inquiries from the district court in the event that the court "contemplate[d] any Guidelines adjustments, departures, or calculations different from those stipulated to [in the agreement]." Id. at 134 (second brackets in original). The defendant asserted that the government breached the agreement when it argued by letter that the district court "would be well within its discretion in upwardly departing" before explaining in detail why such a departure would be appropriate. Id. (internal quotation marks and citation omitted). We stated that the government's letter was "too close in tone and substance to forbidden advocacy to have been well-advised," id. at 134, and "came very close to breaching the agreement," id. at 135.

13

We found no breach, however, for three reasons: First, the letter was submitted in response to a solicitation by the court. Id. at 134-35. Second, the plea agreement expressly permitted a response to a request from the district court to set forth the relevant facts and advise the court whether a departure would conform to the law. Id. at 135; see also United States v. Goodman, 165 F.3d 169, 172-73 (2d Cir. 1999) (finding no breach where the government responded to a specific request from the district court to "supply the Court with the law and the facts" without advocating that such an adjustment should be imposed), cert. denied, 528 U.S. 874 (1999). Third, the government "did not explicitly advocate a departure" and thereafter repeatedly asserted that it was responding to the court's request but was not advocating an upward departure, in line with the plea agreement. Id. at 135-36.

In United States v. Vaval, 404 F.3d 144 (2d Cir. 2005), we reached the opposite conclusion. There, the defendant pleaded guilty pursuant to a plea agreement to robbery of federal property with a dangerous weapon. Id. at 149. According to the plea agreement, the government was not permitted to "take [a] position concerning where within the Guidelines range determined by the Court the sentence should fall," or to "make [a] motion for an upward departure," as long as no new "information relevant to sentencing" was discovered subsequent to the effective date of the plea agreement. Id. The plea agreement incorrectly calculated the defendant's criminal history to fall within

14

category III rather than category II. Id. at 149. At sentencing, the government acknowledged that the plea agreement prevented the government from seeking an upward departure or recommending a particular sentence within the guideline range, but nonetheless stated, inter alia:

> I find this defendant's criminal history appalling. And the fact that he can sit here today and say that he made a mistake, I find completely disingenuous. Because it is a mistake that he has made over and over and over again in terms of robbing people at gun point and using violence to commit robberies. I understand that the guidelines preclude us from looking at or calculating certain offenses. But certainly this is not this defendant's first or second offense.

Id. at 150. The government, after recounting the factual basis for the defendant's conviction, said: "I just ask the Court to consider all of that when making the Court's decision about where to sentence this defendant." Id. The government concluded: "[B]ased on the information that I had at [the] time [of the plea agreement,] I believed that the defendant was going to be in a [CHC] category three. He is in a category two. I think, technically, I could make an upward departure which I am not." Id. (first brackets added).

The district court, which presided over the trial of Vaval's co-defendants, acknowledged the defendant's objections to the government's statements, but asserted that "[t]he government's remarks do not change any view that the Court had of this case coming out here." Id.

15

We first noted that statements by the government asserting that it did not intend to violate the plea agreement "do not . . . insulate the government against a finding of breach if in fact what was said constituted an argument about where within the range to sentence appellant and/or whether to upwardly depart." Id. at 153. We then concluded that the government's "highly negative characterizations" of the defendant's criminal history did not qualify as mere "information," and that a statement that the government "technically" could make an upward departure recommendation effectively qualified as such a recommendation. Id. ("It is difficult to draw a principled distinction between the government actually moving for an upward departure and stating that it 'technically' could move for such a departure and then adding arguments that would support such a departure."). Furthermore, unlike the government's court-solicited statements in Riera, "all relevant legal and factual information had already been provided to the court, and the government's statements served no purpose other than to advocate that the court upwardly depart or impose a high sentence within the Guidelines range." Id. at 154. As a result, we decided, the government had breached the plea agreement. See also Lawlor, 168 F.3d at 637 (finding that the government breached the plea agreement by asserting that the PSR properly determined the Guidelines range where the plea agreement calculated the range under a different (and lower) Guidelines range); United States v. Enriquez, 42 F.3d 769, 770-71 (2d Cir. 1994) (vacating the

16

sentence based on the government's violation of the plea agreement by arguing against a downward adjustment for acceptance of responsibility where the plea agreement required the government to "agree to a Probation Department finding that the defendant is entitled to a two-level adjustment for acceptance of responsibility").[5]

We have also strictly enforced plea agreements against the government where, as here, the disputed issue concerned enhancements or adjustments to a defendant's total offense level rather than a specific sentence within a given Guidelines range or an upward or downward departure from that range. In United States v. Palladino, 347 F.3d 29 (2d Cir. 2003), the plea agreement prohibited the government from moving for an upward departure from the Guidelines range estimated in the agreement "based on information known to [the United States Attorney's Office] at this time." Id. at 33. The estimated total offense level on which that range was based, however, was "not binding" on the government, and the defendant was not permitted to

---

[5] We have also applied this analytical framework to government breaches of plea agreements after the initial sentence has been executed. See United States v. Carbone, 739 F.2d 45, 46-47 (2d Cir. 1985) (concluding that the government breached its promise to "make no recommendation to the sentencing judge as to the sentence which Stephen Carbone may be given" when it strenuously opposed a "split sentence" requested by the defendant after the district judge announced a 30-month term of imprisonment); United States v. Corsentino, 685 F.2d 48, 51-52 (2d Cir. 1982) (finding that the government breached the plea agreement when, despite its agreement to "take no position" on the defendant's sentence, it advocated against permitting the possibility that the defendant might receive an earlier parole).

17

withdraw his plea if the government advocated for a different offense level. Id. The agreement calculated the adjusted offense level to be ten. Id. At sentencing, the government sought a six-level enhancement based on information it conceded was not new. Id. at 34. We concluded that this violated "the language and the spirit" of the plea agreement, id. at 30; at best, the language was ambiguous and was therefore construed against the government, id. at 34.

In Griffin's plea agreement, the government committed itself "not to oppose the recommendation that the Court apply the two (2) level downward adjustment of Guidelines §3E1.1(a) (acceptance of responsibility) and further agree[d] to move the Court to apply the additional one (1) level downward adjustment of Guidelines §3E1.1(b)." Plea Agreement, at ¶ 12. The agreement also permitted the government to "respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government." Plea Agreement, at ¶ 18b.[6]

In response to the defendant's objections to the PSR, the government discussed the possible downward adjustment for

_____

[6] In Griffin's plea agreement, the government was permitted to "advocate for a specific sentence within the Guidelines range" and to "modify its position with respect to any sentencing recommendation or sentencing factor under the Guidelines . . . in the event that subsequent to this agreement the government receives previously unknown information regarding the recommendation or factor." Plea Agreement at ¶ 18. Neither party cites either of these provisions on this appeal, so we do not consider their relevance, if any.

18

acceptance of responsibility under U.S.S.G. § 3E1.1 in two separate written submissions to the district court. It first noted that "the government is troubled by some of the defendant's objections which seem to raise questions regarding whether the defendant has truly accepted responsibility." Gov't March 31 Statement, at 1. But the submission continued: "However, the defendant did timely notify authorities of his intention to enter a guilty plea, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." Id. at 1-2. The government then proceeded to recommend that the defendant receive the additional one-level decrease for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(b) should the district court find that the defendant is entitled to the two-level adjustment under U.S.S.G. § 3E1.1(a). Were this the government's only communication addressing acceptance of responsibility, we would have little trouble characterizing this submission as containing a "few ill-advised descriptive words" that fall short of breaching the plea agreement. See Riera, 298 F.3d at 135.

But the government addressed the issue of acceptance of responsibility a second, separate time. In response to Griffin's arguments, permitted by the plea agreement, see Plea Agreement, at ¶¶ 8-9, that no relevant conduct was applicable to his sentencing beyond that to which he pleaded guilty, the government wrote that "the defendant is attempting to limit his conduct to

19

only that to which he pled guilty," which "leads the government to question whether the defendant has truly accepted responsibility pursuant to U.S.S.G. § 3E1.1(a)." Gov't April 15 Response, at 21. The government then reviewed the legal framework of a downward adjustment for acceptance of responsibility, concluding: "It is unclear whether the defendant's objections to the inclusion of all the relevant conduct rises to the level of outweighing his acceptance of responsibility. Suffice it to say that the defendant's objections to the relevant conduct raises [sic] questions on the issue of acceptance." Id. at 22.

This was well beyond the pale. No discussion of an acceptance of responsibility adjustment was solicited by the court. Cf. Riera, 298 F.3d at 134-35. It was not an effort simply to correct an inaccurate representation of relevant sentencing law. See Amico, 416 F.3d at 166 ("In view of the defendant's inaccurate description of the law relating to aggravating role, the government was entitled to explain the law concerning this adjustment without violating its agreement."). Nor did the government merely provide information or evidence in response to any statements by the defendant. Plea Agreement, at ¶ 18b. Instead, the government, on its own initiative, warned the court about what it considered to be "troubling" statements by the defendant in his submission to the court in anticipation of sentencing.

20

The government did nothing to retract its questionable statements or otherwise ameliorate their impact. Cf. Amico, 416 F.3d at 165 (noting that "a retraction of an argument advanced by the government in violation of its plea agreement would [not] always cure its breach," but concluding that the "temporary breach" of a "mild, brief, and unassertive form," combined with a "rapid retraction," sufficiently cured any breach). Instead, the government followed up its first statement of misgivings regarding the defendant's objections with both a reiteration of its doubts regarding the defendant's acceptance of responsibility and an unsolicited review of law relevant to denying the adjustment. See Gov't April 15 Response, at 21–22.

The government argues that it adhered to its promise in the plea agreement throughout the sentencing hearing by advocating for a sentence within a Guidelines range that included the downward adjustment for acceptance of responsibility and by expressly stating that it did "not advocat[e] for anything beyond what's in the plea agreement." Sent'g Hrg. Tr, June 21, 2005, at 5, 15. These indirect references to an acceptance of responsibility adjustment do not, we think, effectively retract the previous statements or cure any breach.[7] And we have

---

[7] Even if we agreed that Griffin "opened the door" during the sentencing hearing by denying relevant conduct that the district court later determined to have occurred, see Amico, 416 F.3d at 165, this would not be relevant to the breach of the plea agreement, because the government's sentencing letters were submitted prior to the sentencing hearing and prior to the district court's explicit warnings to Griffin about the perilous nature of his denial of such conduct in light of the guidelines

21

determined that statements by the government asserting that it did not intend to violate the plea agreement "do not . . . insulate the government against a finding of breach if in fact what was said constituted an argument" that violated the plea agreement. Vaval, 404 F.3d at 153. "Given the government's often decisive role in the sentencing context, we will not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness." Lawlor, 168 F.3d at 637.

This is not to say that the plea agreement required the government to remain silent were the defendant to make statements inconsistent with the government's understandings. It did not. But the government did more than correct inconsistencies in fact or law with information or evidence available to it, as permitted by the plea agreement. Instead, it offered a thorough legal analysis, unsolicited by the court, and concluded by noting its own skepticism as to whether the defendant satisfied the requirements for an adjustment for acceptance of responsibility as set forth by its analysis.

To paraphrase our conclusion in Vaval, 404 F.3d at 153, it is difficult to draw a principled distinction between the government voicing outright opposition to a downward adjustment for acceptance of responsibility and stating that the defendant's conduct was "troubling" and "raises questions on the issue of

---

pertaining to acceptance of responsibility. See, e.g., Sent'g Hr'g Tr., May 23, 2005, at 18-20.

acceptance." Without expressly opposing such an adjustment, which would have been a more obvious and egregious breach of the plea agreement, the government could have done little more to attempt to persuade the court to deny an adjustment for acceptance of responsibility. After the first letter directly addressing the issue of acceptance of responsibility, "the government's statements served no purpose other than to advocate that the court" deny an adjustment for acceptance of responsibility. Id. at 154.

That the district court disclaimed the government's statements does not alter our conclusion. "Where the sentencing court has sentenced in accordance with a position improperly advocated, while claiming not to have been influenced by the improper advocacy, a reviewing court can do no more than speculate as to whether the judge was in fact influenced, even unconsciously." Amico, 416 F.3d at 168. We therefore conclude that although the government's mistake was a common one made in the course of strongly felt and doubtlessly well-intentioned advocacy, it breached the plea agreement by urging, in effect, that the district court deny a downward adjustment for acceptance of responsibility.

C. The Dissent

Judge Wesley does not dispute that the government was forbidden by the plea agreement from making the statements in its April 15 communication to the district court. And he agrees that "the government[, therefore,] breached [the plea agreement]

23

before the sentencing hearing" took place.  Dissent at **[7]**.  Neither does he assert that there is, nor can we find, anything in the plea agreement that (1) renders it a breach for the defendant to make a false statement, confirm that he previously made one, or to correct one, or (2) expunges or renders harmless the government's previous breach in the event of any such action by or on behalf of the defendant.  See id. at **[9]**.  Indeed, the plea agreement explicitly anticipates the possibility of such untruthfulness by reserving for the government the right to "respond at sentencing to any statements made by the defendant or on the defendant's behalf that are inconsistent with the information and evidence available to the government."  Plea Agreement at ¶ 18.[8]

Embracing, instead, an argument that the government never made, the dissent is focused on the fact that at the time of the plea hearing -- several months after the government's breach -- "the defendant did not continue to maintain his [previous] denial," dissent at **[7]**, in response to the PSR, as to "knowledge [by him] of the BabyJ video."  Id. at **[3]**.  Griffin "recant[ed], showing that his earlier denials had been untruthful."  Id. at **[8]**.  The dissent would hold that this concession of misstatements by the defendant excuses the

---

[8]  This is not to suggest that the defendant was free to lie with impunity.  He was, of course, subject to sanction for testifying falsely, obstructing justice, or perhaps otherwise for proffering untruthful information in this context.

government from having failed previously to "strict[ly] compl[y]" with the agreement. Id. at **[10]**. We do not see how. We know of no authority for the proposition that a defendant's concession of previous misstatements during sentencing excuses the government from its previous noncompliance with the plea agreement, nor any theory upon which we think such a proposition could reasonably be based.

This is not a case where the government sought to renounce a plea agreement because the defendant had breached it. See United States v. Cruz-Mercado, 360 F.3d 30, 39 (1st Cir. 2004) (cited by the dissent, at **[9]**). The government flatly and materially breached the plea agreement by advocating against an acceptance of responsibility adjustment. Only now does the dissenter search the record to find a misstatement by the defendant on the basis of which he would have the court bestow a pardon on the government for its breach. Especially having carefully reviewed our oft-repeated dictum that "courts construe plea agreements strictly against the Government . . . for a variety of reasons, including the fact that the Government is usually the party that drafts the agreement, and the fact that the Government ordinarily has certain awesome advantages in bargaining power," United States v. Ready, 82 F.3d 551 (2d Cir. 1996), we conclude to the contrary that the government was, and remained, bound by its plea agreement and responsible for its material breach thereof.

25

## D.  Remedy

The appropriate remedy for a breach of a plea agreement is "either to permit the plea to be withdrawn or to order specific performance of the agreement."  Lawlor, 168 F.3d at 638 (citation omitted).  The defendant seeks only specific performance here.  We therefore vacate the sentence and remand for resentencing.

In doing so, we must remand to a different district judge.  Id.  Although in most other contexts we resist such a course of action, we have concluded that it is appropriate where a plea agreement is concerned; "the government's breach of its commitment is difficult to erase if the case remains before the same judge, because the judge's decision . . . was based on his assessment of the facts."  Id. (quoting Enriquez, 42 F.3d at 772).  It is an understatement to observe, in light of the transcript of the proceedings in the district court, that this "disqualification results not from any inappropriate action on [the judge's] part, but by reason of the government's failure to adhere to its contractual obligation."  Id. (internal citation omitted).  But "the government-rung bell cannot be unrung."  Riera, 298 F.3d at 134.  If the district court were again to deny acceptance of responsibility, even if such an action is warranted, there is no way to be certain that the government's breach had no effect on that determination.  Treating this course of action as a prophylactic rule ensures that the appearance of

justice will not be compromised, see United States v. Kaba, 480 F.3d 152, 159 (2d Cir. 2007), and, of course, encourages punctilious respect for similar agreements in the future.

We therefore remand to a different judge reluctantly. The district court proceeded with what we view as extraordinary diligence. The hearings it held were unusually lengthy and complex. The extent to which this exemplary effort will be wasted is a matter of no small concern. We conclude nonetheless that we are required to do so by our case law and the principles underlying it.

### E.  Other Arguments

The defendant makes several additional arguments. Of particular note are his assertions that the government violated Federal Rule of Criminal Procedure 16 and Brady by failing to turn over a copy of his hard drives, and his challenges to the district court's application of sentencing enhancements for trafficking and distribution based on his use of KaZaA. We often address issues raised on appeal that are not central to the disposition of the appeal and might ordinarily be inclined to do so here. On this sentencing appeal, however, we choose to exercise our discretion not to do so for several reasons.

First, subsequent to the sentencing proceedings below, Congress passed a law that requires that "any property or material that constitutes child pornography . . . shall remain in the care, custody, and control of either the Government or the

27

court."  Adam Walsh Child Protection and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 629, 631 (codified at 18 U.S.C. § 3509(m)(1) (2006)).  This law appears to track closely the government's former policy in that it prohibits the government from providing a copy of any "property or material that constitutes child pornography" to a defendant, notwithstanding the requirements of Rule 16 of the Federal Rules of Criminal Procedure.  Id. § 3509(m)(2)(A).  A defendant or his or her expert may only examine the property at a government facility. Id. § 3509(m)(2)(B).  Interpretations of this provision have begun to percolate through the district courts but, to the best of our knowledge, no Court of Appeals has yet addressed it.  See generally Adam Liptak, Locking Up the Crucial Evidence and Crippling the Defense, N.Y. Times, Apr. 9, 2007, at A10.  In light of this change in the law subsequent to Griffin's sentence on an issue he raises before us for the first time on appeal, we think it better for the district court to address his arguments under Rule 16 and Brady and to await possible further developments in the law in this regard before addressing it if indeed we eventually must in this case.[9]

Second, despite the lengthy sentencing hearing directed primarily at understanding the use, function, and operation of

---

[9] Because we do not address the Rule 16 argument, we need not determine, on the present record and at this point, whether Griffin requested a copy of the hard drive prior to sentencing as required.

28

KaZaA, we find the record to be, through no apparent fault of the court, confused and difficult to follow. The court repeatedly expressed its frustration in this regard. See, e.g., Sent'g Hr'g Tr., June 21, 2005, at 75 ("To the Government, I think you're making this way [too] confusing . . . ."); Sent'g Hr'g Tr., July 13, 2005, at 22 ("In this case, because of issues that have arisen at the fault of the Prosecution and law enforcement, frankly, this is now the fourth day of this hearing. What boggles my mind, I've rarely heard an agent testify as [an FBI] agent did on the stand. He changed a report without indicating it was an amended report."); Id. at 33 ("This is what the case is all about, KaZaA. I can't believe in the FBI somebody doesn't know about KaZaA. It doesn't have to be a live witness [i]f I had an affidavit from somebody explaining to me how KaZaA works . . . ."). Moreover, on remand, the defendant or his expert witness may be afforded an opportunity to inspect the computer hard drives in an effort to complete the record, which may be of benefit to what at least seem on the surface to present complicated technical issues. We think our review of this argument, should we be required to conduct one, would benefit from further exposition and clarification in the district court.

Finally, when remanding for a retrial on the merits, we do, of course, often decide issues that are not strictly before us when they are likely to arise again in the course of the retrial. See, e.g., United States v. Shellef, 2007 WL ----, *?,

29

2007 U.S. App. LEXIS 25974, *52 (2d Cir. Nov. 8, 2007) (addressing various issues "because they [were] likely to arise again on remand and retrial . . . even though their resolution [was] not strictly necessary in order to decide th[e] appeal."); United States v. Amico, 486 F.3d 764, 767 (2d Cir. 2007) (vacating the conviction and addressing "only those issues calling for guidance on remand"); United States v. Quattrone, 441 F.3d 153, 182 (2d Cir. 2006) (addressing evidentiary rulings on appeal where conviction was vacated and remanded for retrial based on a flawed jury instruction). Deciding them may save the investment of the substantial judicial resources -- as well as those of counsel and members of another jury -- that might be required by yet another remand should we eventually decide those additional issues contrary to the view of the district court. Yet another complete retrial might well follow. The resources expended, however, tend to be considerably less where, as here, the remand is confined to resentencing and subsequent additional sentencing hearings rather than a subsequent retrial on the merits. Cf. United States v. Leung, 40 F.3d 577, 586 n.2 (2d Cir. 1994) ("Our slightly greater willingness, when there are extenuating circumstances, to entertain sentencing objections that were not presented to the District Court may reflect the different impact on the judicial system engendered by vacating a sentence in comparison with reversing a conviction. Unlike trial errors, whose correction requires a new trial that a timely

objection might have obviated, correcting sentencing errors usually demands only a brief resentencing procedure.") (citing United States v. Baez, 944 F.2d 88, 90 n.1 (2d Cir. 1991)).

The remaining subsidiary arguments are also best left for the district court to address in the first instance.

**CONCLUSION**

The case is remanded to the district court with the direction that it be assigned to a different district judge for the court to vacate the current sentence and impose sentence de novo.

31